431 F.2d 308
 Charles T. HENNIGAN, Plaintiff-Appellee,
v.
CHARGERS FOOTBALL COMPANY, a Partnership, d/b/a the San Diego Chargers, and Eugene V. Klein and Samuel Schulman, General Partners in that Partnership, Defendants and Third-Party Plaintiffs-Appellants,
v.
HOUSTON OILERS, INC., Third-Party Defendant.
 No. 28376.
 United States Court of Appeals, Fifth Circuit.
 July 27, 1970.
 
 Harold Peterson, Beaumont, Tex., Ernest C. Hurst, Houston, Tex., for appellants.
 Floyd W. Addington, Jasper, Tex., for appellee.
 Daniel L. Martin, New York City, for American Football League, amicus curiae.
 Before WISDOM, AINSWORTH and CLARK, Circuit Judges.
 AINSWORTH, Circuit Judge:
 
 
 1
 In this Texas-based diversity case[1] we must determine whether a former professional football player is entitled to compensation from his Club for the 1967 season of the American Football League (AFL). The player was sent home when he reported for the team's 1967 training camp too injured to play. Terminated without pay, he seeks redress under the terms of the contract establishing the various rights and obligations of the player and his Club during the so-called option year to which every AFL player commits himself when he signs a standard contract to play football in the League. The District Court granted a summary judgment in favor of the player. This appeal by the Club requires us to consider basic aspects of the Standard Players Contract employed by member clubs of the AFL. The issues with which we deal are (1) whether the team's "renewal" of the player's 1964-1966 contract obligated the Club to pay the player salary in 1967 under the injury clause of the contract and (2) whether this "renewal" required the Club to pay the player under the "no-cut" clause of the 1964-1966 contract.
 
 I.
 
 2
 The undisputed facts in this case are as follows. On March 19, 1964, Charles T. Hennigan, appellee, signed an AFL Standard Players Contract (AFL Contract) for three years with the Houston Oilers, Inc., a member club of the AFL. A "no-cut" clause was made a part of that contract as an addition to paragraph 6. Both the Standard Players Contract form and the "no-cut" clause form used by the parties are among the standard forms the League requires its member clubs to use.
 
 
 3
 Paragraph 1 of Hennigan's AFL Contract states:
 
 
 4
 "The term of this contract shall be from the date of execution hereof until the first day of May following the close of the football season commencing the calendar year 1966, subject, however, to termination, extension or renewal as specified herein. The phrase `football season' as used herein shall mean the period commencing with the first and ending with the last football game on the League's regular schedule for any year."
 
 
 5
 (Printed form matter is in regular type; inserted typewritten matter [the numerals "66"] is in italics.) Thus Hennigan's services as a professional football player were to be regulated by the provisions of the AFL Contract through the 1966 football season, and the term of the Contract was expressly made subject to "termination, extension or renewal as specified" elsewhere in the Contract.
 
 
 6
 Paragraph 6 of the AFL Contract specifies grounds upon which an AFL club may terminate its obligations to a player under the Contract. It reads as follows:
 
 
 7
 "The Player represents and warrants that he has and will continue to have during the entire term hereof both the excellent physical condition and the highly developed skills in all types of football team play necessary to play professional football of the caliber required by the League and the Club, and agrees to perform his services hereunder to the complete satisfaction of the Club and its Head Coach. Player shall undergo a complete physical examination by the Club physician at the start of each training season during the term hereof. If Player fails to establish his excellent physical condition to the satisfaction of the Club physician by the physical examination, or after having so established his excellent physical condition, if in the opinion of the Head Coach does not maintain himself in such excellent physical condition or fails at any time during the football seasons included in the term of this contract to demonstrate sufficient skill and capacity to play professional football of the calibre required by the League and by the Club, or if in the opinion of the Head Coach the Player's work or conduct in the performance of this contract is unsatisfactory as compared with the work and conduct of other members of the Club's squad of players, the Club shall have the right to terminate this contract, such termination to be effective when the Club sends to the Player written notice of such termination."
 
 
 8
 In Hennigan's AFL Contract the following sentence (the "no-cut" clause) was added to paragraph 6:
 
 
 9
 "Notwithstanding the foregoing, the Club, so long as the Player fulfills his representation and warranty that he has and will continue to have excellent physical condition and fulfills his agreement that he will perform services hereunder as directed by the Club and its Head Coach (except to the extent the Player is excused from such performance pursuant to paragraph 15 hereof), agrees that it will not, prior to the first day of May following the close of the football season beginning in the calendar year 1966, terminate this contract because of the Player's lack of skill or capacity to play professional football of the caliber required by the League and by the Club or because the Player's work or conduct in the performance of this contract is unsatisfactory as compared with the work and conduct of other members of the Club's squad of players."
 
 
 10
 (Form matter is in regular type; inserted typewritten matter [the numerals "66"] is in italics.) This was the clause bargained for by Hennigan.
 
 
 11
 Paragraph 15 of the Contract, which excuses "such performance" as is referred to in paragraph 6, as amended by the "no-cut" clause, is the standard injury provision contained in AFL player contracts. It reads in pertinent part as follows:
 
 
 12
 "In the event that Player is injured in the performance of his services under this contract, and if Player gives written notice to the Club physician of such injury within thirty-six hours of its occurrence, the Club will: (1) provide, during the term of his contract, such medical or hospital care as in the opinion of the Club physician may be necessary; and (2) continue during the term of this contract to pay Player his salary as provided in paragraph 3 or 10 hereof, whichever is applicable, if and so long as it is the opinion of the Club physician that Player, because of such injury, is unable to perform the services required of him by this contract. * * * Except as provided in this paragraph, Player's failure for any reason whatsoever to perform this contract or the services required of him by this contract * * * shall entitle the Club at its option to terminate this contract, such termination to be effective when the Club sends to the Player written notice of such termination. Player's death shall automatically terminate this contract. The rights of termination set forth in this paragraph shall be in addition to the rights of termination set forth in paragraph 6 hereof and any other rights of termination under the law."
 
 
 13
 As stated in paragraph 1 of Hennigan's AFL Contract, the term of the contract was to be from the date of its execution, March 19, 1964, until the first day of May following the 1966 football season, "subject, however, to termination, extension or renewal as specified herein." "Renewal" is specified in paragraph 10 of the Contract:
 
 
 14
 "The Club may, by sending notice in writing to the Player, on or before the first day of May following the football season referred to in paragraph 1 hereof [This was the 1966 season in Hennigan's contract.], renew this contract for a further term of one (1) year on the same terms as are provided by this contract, except that (1) the Club may fix the rate of compensation to be paid by the Club to the Player during said further term, which compensation shall not be less than ninety per cent (90%) of the sum set forth in paragraph 3 hereof and shall be payable during the football season in such further term in installments proportionate to those in such paragraph 3, and (2) after such renewal this contract shall not include a further option to the Club to renew the contract. The phrase `rate of compensation' as above used shall not be understood to include bonus payments or other payments of any nature whatsoever unless specifically agreed to by the Club and the Player."
 
 
 15
 The only express reference in the Contract to "extension" is found in paragraph 14:
 
 
 16
 "Should Player become a member of the Armed Forces of the United States or any other country or retire from professional football as a player prior to the expiration of this contract or any option contained herein, and subsequently be released from the Armed Forces or return to professional football as a player, then and in either event the time elapsed between Player's induction into the Armed Forces and his discharge therefrom, or between his retiring from professional football as a player and his return thereto, shall be considered as tolled, and the term of this contract shall be considered as extended for a period beginning with Player's release from the Armed Forces or his return to professional football as a player, as the case may be, and ending after a period of time equal to the portion of the term of this contract which was unexpired at the time Player entered the Armed Forces or retired from professional football as a player; and the renewal option contained herein shall be considered as continuously in effect from the date of this contract until the end of such extended term. * * *"
 
 
 17
 (Emphasis added.)
 
 
 18
 Paragraph 3 is the compensation provision of the Contract which is applicable to the express contract term (the 1964-1966 seasons in Hennigan's Contract) set out in paragraph 1. In Hennigan's Contract this paragraph reads in part as follows:
 
 
 19
 "For the Player's services as a skilled football player during the term of this contract, and for this agreement not to play football or engage in activities related to football for any other person * * * during the term of this contract and for the option hereinafter set forth [in paragraph 10] giving the Club the right to renew this contract, * * * the Club promises * * * to pay the Player each football season during the term of this contract, unless changed under paragraph 10 hereof, the sum of $21,000. * * *"
 
 
 20
 (Printed form matter is in regular type; inserted typewritten matter ["$21,000."] is in italics.)
 
 
 21
 Hennigan claims that the Chargers broke the promises made in paragraph 3 (compensation provision) and paragraph 10 (option provision) with respect to the 1967 football season. He makes this claim under the following circumstances, which the parties do not dispute: (1) Hennigan engaged in professional football as a player for the Houston Oilers through the 1966 football season. (2) While in the performance of his services, as a professional football player for the Oilers, Hennigan sustained injuries to his right knee during both the 1965 and 1966 football seasons. (3) In March 1967 the Oilers exercised the Club's right under paragraph 9 of the contract with Hennigan and assigned the contract to the San Diego Chargers. (4) In April 1967 the Chargers, as the assignee of Hennigan's AFL Contract, exercised the "renewal" option under paragraph 10 of the Contract by means of a letter stating: "This letter will certify that the San Diego Chargers Football Club hereby exercises its option to renew its player contract with you for a further term as provided in Paragraph 10 of the American Football League Standard Player Contract, executed by you. * * *" (5) In July 1967 Hennigan reported as directed to the Chargers for the beginning of the training season. Upon reporting, he was examined by the Chargers' physician as required by paragraph 6 of the AFL Contract. The physician determined that Hennigan's right knee, which had been operated upon in February 1967, would not at this time "stand up to the stress and strain of professional football." Accordingly, the physician recommended that Hennigan be rejected for service as a player. (7) On the basis of the physician's report, the Chargers claimed the right under paragraph 6 to terminate its contractual relations with Hennigan because of Hennigan's physical incapacity to perform services as a professional football player, and a wire was mailed to the AFL President which stated: "Charles Hennigan failed physical examination and has been sent home to Louisiana. San Diego Chargers waive Charles Hennigan." (8) Hennigan returned home and performed no services for the Chargers during the 1967 football season.
 
 
 22
 This suit was subsequently commenced by Hennigan against the Chargers to recover the salary that would have otherwise been payable to him for the 1967 football season had the Chargers not acted to terminate the player's contract.[2] Hennigan asserted two bases for recovery under his contract with the Chargers for the 1967 season. He contended, first, that because he had sustained the disabling injury to his right knee while performing services under the AFL Contract the Oilers had assigned to the Chargers, paragraph 15 of that contract (the injury clause) obligated the Chargers, by virtue of the latter's exercise of the "renewal" option, to pay him his salary for the 1967 season. Secondly, and in any event, he contended that the "no-cut" clause added to paragraph 6 was applicable and operative during the 1967 season and expressly precluded the Chargers from terminating the "renewed" contract because of Hennigan's lack of capacity to play professional football.
 
 
 23
 On a record comprised of pleadings, answers to interrogatories, and various exhibits and affidavits, each party moved for a summary judgment on the issue of the Chargers' liability to Hennigan. In response the District Court found that there was no contested issue of material fact and concluded in part that (1) Hennigan was unable to perform the services required of him and lacked capacity to play professional football because of injury he had sustained, (2) the "no-cut" clause was binding upon the Chargers upon the exercise of the "renewal" option, (3) Hennigan was entitled to recover under the terms of the "no-cut" clause, and (4) he was entitled to recover under the terms of the injury provision. Accordingly, the District Court granted Hennigan's motion and denied the Chargers' motion. From these actions the Club appeals, contending that it, rather than Hennigan, was entitled to a summary judgment in its favor.
 
 
 24
 In this diversity case we decide the propriety of the summary judgment granted below in accordance with the federal standards fixed in Rule 56(c) of the Federal Rules of Civil Procedure. Rule 56(c) provides that a summary judgment may be granted only when the record shows that "* * * there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. * * *" As we have said:
 
 
 25
 "This principle is the corollary to the rule of this Court that the sufficiency of evidence to require jury submission in diversity cases is a question of federal law. * * * To be sure, in proceedings on motions for summary judgment questions of state law will arise in determining the materiality of particular facts to the claims and defenses of the parties and the factual elements required to establish the claims or defenses of the moving party, but whether a trial is necessary is a matter of federal law."
 
 
 26
 Lighting Fixture and Elec. Sup. Co. v. Continental Ins. Co., 5 Cir., 1969, 420 F.2d 1211, 1213 (citations omitted).
 
 
 27
 We conclude that a summary judgment in this case was proper. For reasons that follow, we further conclude that the San Diego Chargers, not Hennigan, was entitled to a judgment as a matter of Texas law. Accordingly, we reverse the judgment of the District Court.
 
 II.
 
 28
 In paragraph 15 (the injury clause) of the AFL Contract, the words "In the event that Player is injured in the performance of his services under this contract" set forth a condition precedent, the occurrence of which must take place before the Club's duty to perform the promises it makes in that paragraph arises. See City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 519 (Tex.1968). It is undisputed that Hennigan was injured while performing services for the Houston Oilers as required of him by the contract he signed with the Oilers in 1964. This contract, whose term was to expire on May 1, 1967, subject to "termination, extension or renewal," was assigned to the San Diego Chargers while in effect and neither previously "extended" nor "renewed." By accepting the assignment, the Chargers assumed the Oilers' obligations to Hennigan under paragraph 15 and the "no-cut" clause added to paragraph 6 of the 1964 contract. Hennigan contends that the Chargers, by exercising the "renewal" option in paragraph 10, became obligated to pay him his salary for the 1967 football season, notwithstanding that he was sent home after failing the Club's physical examination, because the contract under which he was injured in 1965 and 1966 and the "renewed" contract under which he reported to the Chargers in 1967 were one and the same. Therefore, he claims the Chargers Club was not relieved of the obligation to pay him for the 1967 season (the "further term" of the "renewed" contract) because he was physically incapable of passing the Club's physical examination at the beginning of the 1967 training season. The Club does not dispute the fact of Hennigan's injuries, when they occurred, or the reason for which the player was sent home without pay. It contends instead that its exercise of the "renewal" option had the effect of creating a new contract with Hennigan. Because Hennigan's disabling injuries occurred in 1965 and 1966, before the 1967 contract was made, the Club contends that the condition precedent to its duty to pay Hennigan for the 1967 season never took place, that is, Hennigan was not injured while in the performance of any services required of him by the option-year contract. The parties thus join issue regarding the proper interpretation of the AFL Contract.
 
 
 29
 This case, ultimately, turns upon the meaning that should be ascribed to the term "renewal" and its variations as they appear in the AFL Contract signed by Hennigan with the Houston Oilers in 1964. Paragraph 10 of the AFL Contract grants the Club an option, in consideration for the compensation to be paid the player under paragraph 3, to "renew" the contract signed in 1964 for a "further term" of one year on the same terms as are provided by the 1964 contract, with stated exceptions. Considered by itself, the term "renew" is susceptible to two meanings. The option to "renew" for a "further term" may mean, as the Chargers and the AFL contend, that the Club has the right to hold the player to a new, one-year contract, as distinguished from the then existing, possibly multiyear contract. On the other hand, the option to "renew" may mean, as Hennigan contends and the District Court concluded, that the Club has the right to keep the then existing, possibly multiyear contract in force for one more year, with the respective rights and obligations of the Club and the player in the last year as specified in paragraph 10. To determine the meaning of the term "renew" in the context of Hennigan's AFL Contract, we turn to the Texas decisions on the interpretation and construction of contracts.
 
 
 30
 In Texas, whether the language of a contract is ambiguous is a question of law for the court. Maryland Casualty Co. v. State Bank & Trust Co., 5 Cir., 1970, 425 F.2d 979; City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex.1968). If the contract in issue is unambiguous, its interpretation and construction are part of the court's law obligation. City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex.1968); Myers v. Gulf Coast Minerals Management Corp., 361 S.W.2d 193 (Tex.1962).
 
 
 31
 A Texas court will deem a contract ambiguous if the contract, after established rules of interpretation have been applied to its language, remains reasonably susceptible to more than one meaning. If the contract is not reasonably susceptible to more than one meaning, the effect to be given it will be determined, in the usual case, from the contract language alone, without resort to other evidence or to consideration of the conduct of the parties in attempting to comply with its terms or with the terms of similar previous agreements. City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex. 1968); Pritchard & Abbott v. McKenna, 162 Tex. 617, 350 S.W.2d 333 (1961). The Supreme Court of Texas has stated:
 
 
 32
 "* * * [W]here an unambiguous writing has been entered into between the parties, the Courts will give effect to the intention of the parties as expressed or as is apparent in the writing. In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls. * * * Generally the parties to an instrument intend every clause to have some effect and in some measure to evidence their agreement. As said in the [Restatement of Contracts § 230 (1932)], `[the] standard of interpretation of an integration, except where it produces an ambiguous result, or is excluded by a rule of law establishing a definite meaning, is the meaning that would be attached to the integration by a reasonably intelligent person acquainted with all operative usages and knowing all the circumstances prior to and contemporaneous with the making of the integration, other than oral statements by the parties of what they intended it to mean.' * * *"
 
 
 33
 City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex. 1968) (citations omitted); see Woods v. Sims, 154 Tex. 59, 273 S.W.2d 617 (1954). See also Butts v. Somers, 441 S.W.2d 288, 289 (Tex.Civ.App. — El Paso 1969, no writ); L. A. Durrett & Company v. Iley, 434 S.W.2d 367, 370 (Tex. Civ.App. — Dallas 1968, writ ref'd n.r.e.).
 
 
 34
 When a question relating to the interpretation and construction of a contract is presented to a court applying Texas law, the court is to follow a three-step procedure so far as is necessary to determine the meaning of the contract, that is, the court is to "[1] take the wording of the instrument, [2] consider the same in the light of the surrounding circumstances, and [3] apply the pertinent rules of construction." City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 519 (Tex. 1968) (emphasis in the original); Spence & Howe Construction Co. v. Gulf Oil Corp., 365 S.W.2d 631 (Tex.1963). If the court determines that the language in issue is clear and unambiguous, then rules of construction, such as resolving doubts in construction against the party who prepared the instrument, e. g., Stowers v. Harper, 376 S.W.2d 34 (Tex.Civ.App. — Tyler 1964, writ ref'd n.r.e.), are not to be applied. Maryland Casualty Co. v. State Bank & Trust Co., 5 Cir., 1970, 425 F.2d 979; General American Indemnity Company v. Pepper, 161 Tex. 263, 339 S.W.2d 660 (1960).
 
 
 35
 Under Texas law the AFL Contract in issue here must be viewed in its entirety, and all provisions must be considered together in the ascertainment of the Contract's meaning. Smith v. Liddell, 367 S.W.2d 662 (Tex.1963); McElreath v. Riquelmy, 444 S.W.2d 853, 855 (Tex.Civ.App. — Houston [14th Dist.] 1969, no writ). Each provision is to be given its reasonable, natural, and probable meaning when considered in relation to the whole, and each must be "construed with reference to every other provision so that the effect of one upon the other may be otained." Beaty v. Maritime Ass'ns — I.L.A. Pension, W. & V. Funds, 442 S.W.2d 823, 825 (Tex. Civ.App. — Houston [14th Dist.] 1969, writ ref'd).
 
 
 36
 Our analysis of the AFL Contract leads us to the conclusion that, when the Chargers exercise the "renewal" option granted the Club by paragraph 10, in essence a new contract was established to set the rights and obligations of the Club and the player during its "further term," as distinguished from the previous term during which the player rendered services. Considering all the provisions of the Contract together, we find that it is not reasonably susceptible to more than this meaning. We reach this conclusion as follows.
 
 
 37
 Paragraph 1 establishes that the term of the contract Hennigan signed in 1964 was to expire on May 1, 1967, subject to prior "termination, extension or renewal as specified" elsewhere in the Contract. The words "termination, extension or renewal," we believe, were intended to refer to three separately definable events. Paragraphs 6 and 15 provide express grounds upon which the Club might properly terminate the Contract before the term of the contract, whether that set out in paragraph 1 (basic term provision) or that provided for in paragraph 10 (option provision), expires. Paragraph 14 is the only contract provision that expressly refers to an "extension" of the contract. Under this paragraph, when the player enters the Armed Forces or retires from professional football as a player before the expiration of the term set out in paragraph 1 or the option granted the Club by paragraph 10, the time elapsed during either of these events is to be tolled, and the term of the Contract is to be considered "extended" for an equivalent period of time. Paragraph 10, on the other hand, refers to a "further term" for which the Contract may be "renewed." During this "further term" the contract terms which are to apply are the "same terms" as were provided for the term set out in paragraph 1, except that the rate of compensation can be fixed by the Club at a lesser amount than that previously bargained for, that no further "renewal" option is afforded the Club, and that the "rate of compensation" during the option year does not include previously made bonuses or other payments unless specifically agreed upon by the parties.
 
 
 38
 We are persuaded that the terms "extension" and "renewal" as used in paragraph 1 were not intended to be synonymous so that "renewal" for a "further term" under paragraph 10 would have the same effect as "extension" of the "term of this contract" under paragraph 14 — that is, continuation of the term set out in paragraph 1. Indeed, it is clear that the draftsmen had in mind to achieve a distinction between an "extension" of the paragraph 1 term and a "renewal" of the Contract for a "further [i. e., a different] term." We must interpret these terms to give effect to that intent.[3] See City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515 (Tex.1968). See also Erickson v. Rocco, 433 S.W.2d 746, 750 (Tex.Civ.App. — Houston [14th Dist.], 1968, writ ref'd n.r.e.).
 
 
 39
 Our reading of the AFL Contract finds support in the clear purpose and effect of paragraph 10. The paragraph grants the Club an option on the player's services as a professional football player. This option may be exercised by the Club on or before May 1 of the year following the last football season covered by the term established in paragraph 1. The obvious purpose of this option is to enable the Club to retain the services of the player against his preference, so long as he desires to engage in professional football as a player, for one football season beyond the expiration of the fixed term bargained for in paragraph 1. Unless the player signs a new AFL Contract, itself with a fixed term and an option provision, the Club is entitled in the option year to fix the player's salary, certainly an important consideration to the professional athlete, at an amount 10 per cent less than the player was receiving previously. Moreover, the player is not entitled to whatever bonus or other payments he may have been receiving previously unless such payments are specifically agreed upon by the Club and the player. If the player retires from professional football as a player following the last season covered by paragraph 1 of his contract, but before May 1 of the year following, paragraph 14 operates to extend the period of time during which the option may be exercised. Similarly, if the player retires after the Club has exercised its option, but before the training season begins and the physical examination required of the player by paragraph 6 is conducted, paragraph 14 operates to extend the term of the option year. In either event, the player, should he ever desire to return to professional football as a player, will be subject to the Club's option on his services for one football season. Paragraph 10 is not included in the AFL Contract for the player's benefit. An interpretation of paragraph 10 that obligates the Club, upon its exercise of the option, to compensate the player for the option year notwithstanding that the player is physically incapable of passing the physical examination required of him before the option-year season begins — and thus is unable to perform any services as a player for the Club, is an unreasonable interpretation of a provision plainly meant to be for the sole benefit of the Club. Hennigan's interpretation would have this effect, and we reject it.
 
 
 40
 The AFL Contract is a contract for personal services. Absent provisions in the agreement to the contrary, we may presume that the parties to a contract for personal services contemplate as one of the contract conditions the continuation of the ability to perform of the person whose services are the subject of the contract. See, e. g., Salter v. Jones, 348 S.W.2d 381, 383 (Tex.Civ. App. — El Paso 1961, no writ). In the AFL Contract, this condition is expressed in paragraph 6, in which the player warrants that "he has and will continue to have during the entire term hereof both the excellent physical condition and the highly developed skills in all types of football team play necessary to play professional football. * * *" If a player under contract with an AFL Club is injured while performing services required of him by that contract, and the player is thereafter unable to perform services because of that injury, the Club is obligated under paragraph 15 to pay him his salary for the balance of the contract term, notwithstanding that the player is no longer able to fulfill the warranty he makes in paragraph 6. In view of the differentiation made in the Contract between an "extended" term (paragraph 14) and a "further term" (paragraph 10) and of the express contract provisions dealing with warranties of ability to perform and the problem of occupational injuries, we do not find that the option to "renew," when reasonably interpreted, was meant to have the effect upon its exercise of carrying forward injuries suffered during the previous term as occurrences giving rise to the Club's duty to compensate the player in the option year under paragraph 15. If this were the effect, then a retired player attempting to return to professional football as a player could require the Club holding the option on his services to decide at its peril whether to exercise that option. Should the option be exercised, the Club would assume the risk that it might have to pay salary to a person unable to perform any services because of injuries sustained prior to his retirement. Should the option not be exercised, the Club would assume the risk that the once-retired player, actually capable of performing services as a player in the League, might sign a new AFL Contract to play for a competitor. Put to the same choice would be the Club holding an option on a player such as Hennigan, injured in the last football season covered by the base term provision of his contract, operated upon during the offseason, and not recovered from the operation when the option period is to expire. We are of the opinion that the option provision does not contemplate that the Club will be required to make this type of decision. We may not, under the guise of interpreting contracts, write agreements the parties themselves never made.
 
 
 41
 From our conclusion that the exercise of its option on Hennigan's services by the Chargers had the effect of making a new contract with the player for a term of one year, it follows that Hennigan was not entitled to compensation for the 1967 football season from the Chargers. He suffered no injury while in the performance of any services required of him after the option was exercised. Consequently, he is not entitled to payment under paragraph 15 (the injury provision). He was terminated for his inability to pass the physical examination. Because, under the undisputed facts of this case, this inability was not excused by paragraph 15 — his disabling injury not having occurred during the option year, the "no-cut" clause did not protect Hennigan from termination, and the proviso in this clause was inapplicable. Moreover, the "no-cut" clause, by its terms, expired on May 1, 1967. Therefore, summary judgment should have been granted in favor of the Chargers on the issue of their liability to Hennigan.
 
 
 42
 Reversed.
 
 
 
 Notes:
 
 
 [1]
 The choice-of-law clause in the contract here in issue chooses the laws of the State of Texas to govern the contract's provisions. We have no reason for doubting that a Texas court would apply its own law to this case. We therefore apply Texas law. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Schewe v. Bentsen, 5 Cir., 1970, 424 F.2d 60
 
 
 [2]
 The Chargers thereafter filed a third-party action against Houston Oilers, Inc., asking indemnity from the Oilers for all sums recovered from the Chargers by Hennigan. This appeal does not deal with this third-party action
 
 
 [3]
 The Texas cases, Corpier v. Lawson, 356 S.W.2d 361, 362 (Tex.Civ.App. — Waco 1962, no writ); Haddad v. Tyler Production Credit Ass'n, 212 S.W.2d 1006 (Tex. Civ.App. — Texarkana 1948, writ ref'd), holding that no distinction is to be drawn between the two terms are inapposite, for they deal only with the frequently litigated question whether a "renewal" provision in a lease requires the execution of a new lease to effect a renewal, as distinguished from an "extension" provision that does not require the execution of a new instrument to effect an extensionCf. Sunac Petroleum Corporation v. Parkes, 416 S.W.2d 798 (Tex.1967). Here we have no question regarding whether a new instrument covering the option year was needed. It was not.
 
 
 CLARK, Circuit Judge (dissenting):
 
 43
 I respectfully disagree with my brothers. In my analysis the majority opinion is leveraged on a result-oriented fulcrum which draws an artificial distinction between the terms "renew" and "extend" as used in this contract. I would affirm the district court for two reasons: (1) Such shade of difference in meaning as may be ascribed to "renew" and "extend" supports the district court's construction of the contract; (2) If that premise is not accepted, the contract at least is ambiguous and reversal of the district court's decision is improper.
 
 
 44
 The majority finds that when "renew" is placed in juxtaposition with "extend" the former term connotes the making of a new contract. This reasoning overlooks or ignores what appears to me to be the more reasonable interpretation of the terms as they appear in this document. As it is used here "extend" most plausibly means a continuation of the contract by operation of the contract itself, whereas "renew" means a continuation thereof as a result of action by the Club — the exercise of an option. If renewal does signify a continuation of the contract for a further term of one year at the option of the Club, then the injury clause clearly frees Hennigan from his warranty of physical fitness since it is undisputed that the injury occurred during the term of the continued contract.
 
 
 45
 Who took the risk that Hennigan's injuries would not heal — the Club which, on April 5, 1967, simply notified him by a letter that they elected to renew his contract for an additional year, or Hennigan who was then left with no choice but to obey the contract for a minimum period of an additional three months? There is no allegation or proof that Hennigan in any way deceived the Club about his injury, operation or the prognosis for his knee April 5, 1967. From all the record shows us, the Club blindly exercised the option because they wanted Hennigan to play football for them if he could play football for any team. To receive this benefit they exercised an option which they wrote, which provided that their notice had the effect of continuing the contract "for a further term of one (1) year on the same terms and conditions provided by this contract" except that the rate of compensation could be reduced up to 10%. As I read the words of the document, the continuation of the contract by the exercise of this option continued the injury clause in the same manner that it continued the restrictions on Hennigan's activities. The narrow insistence of the majority that the injury clause took on a new and prospective application at this juncture is to me unreasonable. The Club had the option but the Club also had to take the risk.
 
 
 46
 Without assuming that the interpretation I opt for is the more reasonable of the possible constructions, the mere fact that there is any reasonable alternative meaning[1] demonstrates the error in reversing the district court. We ought not to reverse his choice of meanings if there was one to be made. Of equal importance, if it is conceded that the contract is ambiguous in its meaning, well-settled principles of contract construction would indicate that Hennigan should prevail, since the Club prepared the form of the contract used. Stowers v. Harper, 376 S.W.2d 34 (Tex.Civ.App. 1964, writ ref'd, n.r.e.); Brandtjen & Kluge, Inc. v. Tarter, 236 S.W.2d 550 (Tex.Civ.App.1951, writ ref'd, n.r.e.); Amory Mfg. Co. v. Gulf, C. & S.F.R. Co., 89 Tex. 419, 37 S.W. 856 (Tex. 1896).
 
 
 47
 Since I would affirm, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 Although alone in my dissent in this case, I am not without respectable company in my assignment of a closely similar denotation to these terms. When Webster's defines "renew" in the connotation of contractual documents — i. e., notes or leases — it states the definition in terms of "extend"See Webster's Third New International Dictionary, n. 7, p. 1922 (1966) and Webster's New World Dictionary, College Ed., n. 8, p. 1232 (1962).