**James McCoy SMITH, Plaintiff,**

v.

**PRO–FOOTBALL, INC. and the National Football League, Defendants.**

**C.A. No. 1643–70.**

United States District Court,
D. of Columbia.

Dec. 8, 1981.

Stuart H. Johnson, Jr., R. Kenneth Mundy, Mozart G. Ratner, Washington, D.C., for plaintiff.

James C. McKay, Paul J. Tagliabue and Gary R. Roberts, Washington, D.C., for defendant National Football League.

Lawrence Lucchino, Washington, D.C., for defendant Pro-Football, Inc.

MEMORANDUM

BRYANT, District Judge.

In 1976, the plaintiff won a private antitrust action in this court and treble damages were awarded. 420 F.Supp. 738. The Court of Appeals affirmed the finding of a violation of the antitrust laws but reversed this court on the measurement of damages and remanded for recomputation of damages. 593 F.2d 1173 (1978). The plaintiff has made a motion for this court to recompute damages. Based on the guidance from the Court of Appeals, memoranda from the parties, and the record in the case, I have found the plaintiff's damages to be $4,000 and thus award him $12,000.

### I. Background

The plaintiff, James McCoy (Yazoo) Smith, was an All-American college football player at the University of Oregon. In 1968 he was drafted by the Washington Redskins, a team operated by Pro-Football, Inc. ("Redskins"), in the first round of the National Football League's ("NFL") player selection draft. No other NFL team was permitted to sign Smith after the Redskins drafted him. Hence, on May 11, 1968, he signed a one-year contract with the Redskins on the Standard Player Contract form required by the NFL. The contract called for a salary of $22,000, an additional $5,000 if he made the team, and a $23,000 "bonus" for signing. He made the team and played well during the 1968 season, but his career was ended when he received a serious neck injury in the final game of the season.[1]

Smith subsequently filed this suit, contending that the draft as it existed in 1968[2] was an unreasonable restraint of trade in violation of §§ 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1, 2, 3, and of § 4 of the Clayton Act, 15 U.S.C. § 15, and had there been no draft he would have been able to negotiate a far more lucrative contract. He

---

1. See 420 F.Supp. at 740–41 and 593 F.2d at 1174–77 for a more complete factual background.

2. The draft is currently operated under rules agreed to in 1977 by the NFL and the National Football League Players Association. 593 F.2d at 1176 n.6.

sought damages for the difference between the amount he would have received in a free market and the amount he actually received.

This court found that the NFL draft was a *per se* violation of the Sherman and Clayton Acts[3] and alternatively that the draft was a violation if tested under the rule of reason.[4]

An estimate of the contract that Smith would have been able to sign in a free market was then made.[5] The estimate was based on the conclusion that the plaintiff would have been able to negotiate a three-year contract which would have guaranteed payment regardless of injury. The size of the hypothetical contract was established by using the annualized payments of $54,000 to Pat Fischer, who played a similar position to Smith and was signed in the same year by the Redskins in what was then the closest thing to a free market.[6] Fischer was a veteran player with the St. Louis Cardinals who was a "free agent", that is, he was eligible to sign with any team. The Cardinals would be compensated for his loss by the team signing him in an amount ultimately determined by the Commissioner of the NFL.[7] When Fischer was signed by the Redskins, the Commissioner refused the Cardinals' request to award the plaintiff to them as compensation, thus establishing what the Court of Appeals called a "very rough index of the two players' comparability."[8] Thus, this court concluded that Smith would have signed a three-year contract, guaranteed regardless of injury, for $162,000.[9]

The amount of compensation Smith actually received was made up of two parts. First, there was the $50,000 total value of the contract he signed. Second, there was the $19,800 paid to Smith in the year following his injury. This was 90% of his prior year's salary, representing what he would have received had he played a second year under the "option" year of his contract. Thus, the total compensation Smith received was $69,800.[10]

This court found Smith's damages to be the difference between what he would have received in a free market minus what he actually received, $92,200, and awarded treble damages of $276,600.[11]

Both sides appealed this court's decision. The plaintiff argued that the amount of damages was too low and advanced a variety of alternative theories for calculating the amount he would have received in a free market. The defendants argued that the finding of antitrust liability was incorrect and that the damage award was excessive. The Court of Appeals found that the draft was not a *per se* violation of the antitrust laws[12] but that it was a violation of the rule of reason.[13]

The Court of Appeals overturned this court's determination of damages and remanded for recomputation of damages.[14] The court said, "there was simply no evidence to support the Judge's finding that Smith, absent the draft, would have been able to negotiate a contract containing a guarantee of three years' full salary, regardless of injury."[15] However, the court found that the comparison to Pat Fischer

---

3. 420 F.Supp. at 744–45.

4. *Id.* at 745–47.

5. *Id.* at 747–49.

6. *Id.* at 748–49.

7. This technique for determining the amount of compensation was known as the "Rozelle Rule", named after Commissioner Rozelle.

8. 593 F.2d at 1190 n.76. Two draft choices were awarded to the Cardinals as compensation for Fischer.

9. 420 F.Supp. at 749.

10. *Id.* at 748 n.8. *See* 593 F.2d at 1176 n.6 for an explanation of the "option" clause in the Standard Player Contract.

11. *Id.* at 749.

12. 593 F.2d at 1177–82.

13. *Id.* at 1183–89.

14. *Id.* at 1189–91.

15. *Id.* at 1190. Footnote omitted.

was not clearly erroneous [16] or unreasonable.[17] Further, the court approved inclusion of the $19,800 in the total actual compensation paid to Smith given the existing factual situation.[18]

On remand, this court must determine the contract terms Smith would have been able to obtain had there been no draft. Smith advances a new theory of how he would have had a multi-year contract that was payable regardless of injury; he repeats his earlier assertions that contracts signed by glamour rookies during the 1965–1966 bidding war are an indication of his free market value, and that if Pat Fischer is used again that the court decide that Fischer's contract was reduced by the value of the draft choices awarded to the Cardinals; and he argues that the $19,800 payment should no longer be included in the total compensation he received from the Redskins. Parts II, III, and IV of this opinion address these three arguments.

## II. Smith's New Theory of Multi-Year Injury Protection

The plaintiff has advanced a novel theory that had he agreed to a multi-year contract, he would have inadvertently been guaranteed payment for the entire length of the contract, regardless of injury. He recognizes that the Court of Appeals found that he could not have *negotiated* for multi-year injury protection,[19] but argues that because of the wording of the Standard Player Contract, had he signed a multi-year contract he would have automatically been guaranteed payment for every year of the agreement.[20]

The plaintiff's theory is based on the wording of the form contract and two district court cases which have considered its meaning. The Standard Player Contract is a four-page printed contract with a small number of blank spaces that are filled in by the parties. For present purposes, portions of three paragraphs are important:

1. The term of this contract shall be from the date of execution hereof until the first day of May following the close of the football season commencing in the calendar year 19__, subject, however, to termination, extension, or renewal as specified herein.

. . . .

6. The Player represents and warrants that ... he is and will continue to be in excellent physical condition .... If Player fails to establish his excellent physical condition to the satisfaction of the Club physician by the physical examination, the Club shall have the right to terminate this contract.

. . . .

14. In the event that Player is injured in the performance of his services under this contract, ... the Club will: ... (2) continue, during the term of this contract, to pay Player his salary....[21]

The interaction of paragraphs 1 and 14 obviously means that if, in 1968, the blank in paragraph 1 was filled in with a "70", the Player would be paid for three years regardless of injury. The defendant concedes this on page 11 of Defendants' Memorandum Regarding Plaintiff's Position on Inadvertent Multiple Year Injury Protection.[22] However, the court finds that it was the practice of NFL teams including the Reds-

16. *Id.*

17. *Id.* at 1190 n.76.

18. *Id.* at 1190. See Part IV of this opinion for the explanation of why it is no longer proper to include this as part of the Redskins' payment to Smith.

19. *Id.*

20. This theory is, of course, in direct contradiction to the plaintiff's assertions since the beginning of the lawsuit more than a decade ago that because of the monopoly power of the NFL draft he was unable to obtain multi-year injury protection. *See* Plaintiff's Amended Complaint, paragraph 17c.

21. Plaintiff's Exhibit 1, *reproduced in* Joint Appendix (J.A.) 196–200.

22. This interpretation of the Standard Player Contract was assumed by the court in *Hennigan v. Chargers Football Company*, 431 F.2d 308 (5th Cir. 1970).

kins to avoid inadvertent multi-year liability by having players sign contracts with a series of consecutive one-year terms.[23] Consecutive contracts each have terms of one year so that the "term" of the contract referred to in paragraph 14 is only a single year.

■ The record shows that in the period immediately before and after Smith signed his contract, the Redskins used two techniques of drafting consecutive single-year contracts so as to limit their liability to a single year. The first technique is exemplified by the contract with Ray McDonald signed in 1967.[24] The 1967 season was contracted for by inserting "1967" in the blank in paragraph 1. The next two seasons were contracted for with the following paragraph inserted between the end of the printed contract and the signature lines:

19. The Player further agrees that this agreement constitutes a contract to play for the Washington Redskins for a further term beginning the first day of May, 1968, until the first day of May,.1969, for the sum of $22,000, and an additional term beginning the first day of May, 1969, until the first day of May, 1970, for the sum of $24,000, under the same terms and conditions as outlined herein.[25]

This paragraph is clearly intended to create two additional independent terms so that when coupled with paragraph 14,[26] the injury protection is only for the remainder of the year in which the injury occurs.[27]

■ The second technique used by the Redskins undoubtedly was intended to have the same effect as the first, but is not as unambiguous. This technique involved using three separate contract forms (assuming the agreement is for three years), each executed at the same time. This technique is the best indication of what Smith would have signed, had he agreed to a multi-year contract, because it was used on June 17, 1968, one month after Smith signed his contract, to sign Gary Beban to three years worth of contracts.[28]

■ The last day of the term of each contract is clear since paragraph 1 says that the contract runs until "the first day of May following the close of the football season commencing in the calendar year 19__,"[29] and each contract has a different year inserted in the blank. However the beginning of the term of each of the contracts is not always clear. On one hand, paragraph 1 says that the term of the contract begins on the date of the execution of the contract.[30] Since all three contracts are executed on the same day, a literal reading of paragraph 1 alone would indicate that the player has one contract that runs for one year from the date of execution, one contract that runs for two years from the date of execution, and one contract that runs three years from the date of execution.

23. *Accord, Alexander v. National Football League*, 1977–2 Trade Cases, ¶ 61,730 at 73000 (D.Minn.1977). *But see, Chuy v. Philadelphia Eagles Football Club*, 431 F.Supp. 254, 262 n.10 (E.D.Penn.1977), aff'd 595 F.2d 1265 (3d Cir. 1979). *See generally*, J. Weistart & C. Lowell, *The Law of Sports* 220–22 (1979).

24. Defendants' Exhibit 50G, *reproduced in* J.A. 453–56. The form contract signed by McDonald is not different in any relevant way from the contract signed by Smith.

25. *Id.* The dollar amounts were inserted by hand in the typed paragraph.

26. In the Standard Player Contract used in 1967 this paragraph was actually number 15. In 1968, it was renumbered as paragraph 14. *See* note 24.

27. The plaintiff's contention that McDonald's agreement provided multi-year injury protection because it was on a single document ignores the words of paragraph 19.

28. *See* Defendants' Exhibit 50M, *reproduced in* J.A. 477–89. The parties agreed in paragraph 18 that the laws of the District of Columbia govern the contract. Under that law, the question of whether a contract is ambiguous is for the court to decide. *Clayman v. Goodman Properties, Inc.*, 518 F.2d 1026, 1034 (D.C.Cir. 1973). The Beban contracts are ambiguous. *Chuy*, 595 F.2d at 1272. Interpretation of ambiguous contracts is the job of the factfinder. *See, Clayman*, 518 F.2d at 1034. Here, the court is the factfinder and what follows is its construction of the ambiguous set of contracts.

29. *See* text accompanying note 21.

30. *Id.*

On the other hand there are three other factors which show that paragraph 1 is not the best indication of the party's intentions as to the beginning date of each contract.

First, typed at the end of the printed terms of each of the three contracts is paragraph 20:

20. It is agreed that this constitutes a NO CUT contract *for the year in which it is operative* any other provisions hereinabove to the contrary notwithstanding.[31]

This clearly shows that the parties considered each contract to be only for the duration of a single year including the football season in which the contract ended as indicated in paragraph 1.

The second factor indicating the party's true intentions is the very existence of the three form contracts. If a single three-year contract were intended, it served no purpose at all to have executed three separate forms if the words of paragraph 1 of the third form were intended to create a three-year contract. Execution of the third form would have been sufficient with a single addendum listing the salary for each year. Executing three forms was intended for the purpose of creating three separate terms for paragraph 14 to apply to.

The third factor indicating the true intentions of the parties is the bonus agreement entered into at the same time as the three form contracts were executed. The body of that agreement reads:

1. For and in consideration of the Player's services under the contracts, dated June 17, 1968, hereunto annexed, and designated as Contract A, Contract B and Contract C, the Club agrees to make the following payment to the Player or for his benefit:

On July 2, 1971, the Club will pay the Player the sum of $65,000.00.

The aforesaid payment constitutes a bonus to the Player, and it is agreed that this sum is guaranteed by the Club and that death, injury or illness of the Player shall not abate or defeat the obligation of the Club in this matter.

2. It is further agreed that military service shall neither toll nor abate nor otherwise affect the aforesaid bonus payment which is payable in all events as set forth hereinabove.

3. In the event of the Player's death before July 2, 1971, the aforesaid payment shall be made to his heirs or designees.[32]

This agreement specifically refers to three contracts rather than one contract. More importantly, the entire thrust of this agreement was to guarantee the payment regardless of injury to the player. This is to distinguish the bonus payment from the payments under the other three contracts which, under paragraph 14, were payable only for the term of each contract should the player get injured.

Thus, from the face of the contracts, it is most likely that the parties intended to create three one-year contracts.

The plaintiff relies heavily on *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979), for the proposition that by executing three form contracts simultaneously, the Redskins would have given three-year injury protection. In *Chuy*, the plaintiff simultaneously executed three separate forms of the Standard Player Contract covering the 1969, 1970, and 1971 football seasons. He was injured in the first season and claimed that he actually signed one three-year contract and should be paid for all three years. The trial court judge ruled that the term of each contract was ambiguous and, as a result, that parol evidence was admissible to determine the true intent of the parties. The jury heard testimony from the negotiators. As recounted by the Court of Appeals for the Third Circuit, *id.* at 1272–73, Chuy testified that he asked for a three-year, "no-cut, no trade"

---

**31.** Defendant's Exhibit 50M, *reproduced in* J.A. 477–89. Emphasis added. A "no cut" contract means that the player will be paid even if he lacks the talent to make the team. It does not affect the operation of paragraph 14 concerning payment after injury. 593 F.2d at 1190 n.77. *See*, Weistart & Lowell, *supra*, at 253, 54.

**32.** Defendant's Exhibit 50M, *reproduced in* J.A. 477.

contract for a total of $100,000 and an advance of $15,000. He said that the Eagles' negotiator countered with a three-year contract which he described as a "$90,000 package", but rejected the no-cut, no-trade proposal. The Eagles' negotiator had a conflicting recollection of the negotiations. The jury found that the Eagles had indeed intended to compensate Chuy for three years, and the Court of Appeals found that if Chuy was believed, there was sufficient evidence to support that verdict. *Id.* at 1273.

The *Chuy* case does not support the assertion that if Smith had signed a series of consecutive contracts, as Gary Beban did, that he would have automatically gotten multi-year injury protection. Rather, the *Chuy* jury found that Chuy successfully negotiated for multi-year injury protection, and the Court of Appeals of the Third Circuit found that there was enough evidence to support that verdict. This does not help Smith because the Court of Appeals for the District of Columbia Circuit has already held that he could *not* have negotiated multi-year injury protection.[33]

The plaintiff's arguments that the defendants in this case are collaterally estopped by *Chuy* from relitigating the effect on multi-year injury liability of signing a series of Standard Player Contracts are meritless. That case merely says that Chuy and the Eagles agreed to a certain set of terms and were ambiguous in the recording of that agreement. It does not mean that, for example, Gary Beban had multi-year injury protection because he signed form contracts with the same facial ambiguity. Instead, the evidence surrounding each set of contracts must be examined by the fact-finder.[34] Again, since the Court of Appeals held that Smith could not have negotiated multi-year injury protection, this court cannot find that had Smith signed a Beban-type set of contracts, he would have now been able to resolve the ambiguity by showing that he had negotiated such protection.[35]

 In sum, the court finds that even if Smith had accepted a "three-year contract", the wording of the Standard Player Contract would not have given him multi-year injury protection given the Redskins' practice of intentionally creating independent consecutive one-year terms. While one of the techniques used for creating separate one-year terms is ambiguous, when the Redskins used this technique, other parts of the contracts resolve the ambiguity. Furthermore, Smith cannot argue that the ambiguity should be resolved in his favor given the Court of Appeals holding that he could not have negotiated for multi-year injury protection.

## III. *Smith's Other Theories of His Free Market Value*

The plaintiff has again raised two theories which, he asserts, should be used to estimate the value of the contract he would have signed in a free market. Given that, as discussed in Part II of this opinion, he could not have been paid for any years following the year in which he was injured, these theories could be useful only in determining what he would have earned for one year.

A. In 1965 and 1966 there was a bidding war between the NFL and the American

**33.** 593 F.2d at 1190.

**34.** *See* note 28.

**35.** In *Sample v. Gotham Football Club, Inc.*, 59 F.R.D. 160 (S.D.N.Y.1973), Chief Judge Edelstein also considered whether a series of simultaneously executed Standard Player Contracts embodied a guarantee of salary for multiple seasons in the event of injury. He held that the contracts were separate and independent; hence no multi-year injury protection. However, according to *Chuy*, 595 F.2d at 1272, the printed terms of paragraph 1 of the form contract had been altered so that the starting date of the later contracts was the ending date of the previous contract. Without the facial ambiguity in defining the term of the contract, this interpretation is obviously correct as a matter of law. *C.f., Alabama Football, Inc. v. Larry Rayfield Wright,* 452 F.Supp. 182 (N.D.Tex. 1977) (consecutive one-year contracts with a team in the now defunct World Football League construed as separate one-year contracts).

Football League for glamour rookies. The plaintiff cites a number of contracts signed by these rookies, in particular that of Roger Bird, and says that they indicate what Smith would have been able to bargain for in a free market. Bird was a first round draft choice who played the same position as the plaintiff. There is something to be said for this comparison. Even though the compensation agreed to during the bidding war is much greater than that which could be sustained by the teams without going out of business, those contracts may indicate that talented rookies were worth more than they were paid after the bidding war ended. However, these arguments were raised on appeal by the plaintiff,[36] and were rejected by the Court of Appeals as "frivolous".[37]

These arguments were raised again on a motion for rehearing on the issue of damages with suggestion for rehearing en banc and the Court of Appeals responded by adding the second and third paragraphs to footnote 77.[38] The plaintiff now argues that the additional paragraphs are actually a *reversal* of the Court of Appeals' conclusion that these arguments are frivolous. The plaintiff contends that the Court of Appeals actually recognized the relevance of the bidding war contracts. This contention is truly frivolous. The actual purpose of the first additional paragraph was to respond to the plaintiff's argument that the no cut contracts negotiated by some players supported this court's original award of damages based on multi-year injury protection. The Court of Appeals was merely stating that a no cut contract does not give multi-year injury protection.[39] The purpose of the second additional paragraph was to clearly state that techniques for estimating plaintiff's damages which had not been presented to the Court of Appeals and re-

jected could still be used by this court to estimate damages. It is unlikely that the court intended that addendum to the last footnote to drastically change its analysis of the validity of the plaintiff's comparisons to the bidding war.

B. The plaintiff also argues that if this court uses Pat Fischer as a basis for comparison again, that the value of the draft choices awarded to the Cardinals as compensation for the loss of Fischer should be added to the value of the contract he signed. This argument was already considered by this court in the original computation of damages. The value of the draft choices awarded to the Cardinals was balanced against the premium in his compensation because the free agent market was player-movement-restricted.[40] The plaintiff raised the argument again on appeal,[41] and the Court of Appeals affirmed this court's analysis.[42] This court believes that its original analysis was correct and, given the agreement by the Court of Appeals, there is no reason to consider the argument again.

Thus, neither of the plaintiff's arguments discussed in this section give any basis for using anything other than Pat Fischer's compensation as a basis for deciding what annual compensation the plaintiff would have been able to obtain in a free market.

IV. *The $19,800 Workmen's Compensation Payment*

As discussed in Part I of this opinion, in the year following Smith's injury, the Redskins paid him $19,800.[43] Section 12 of the Standard Player Contract says:

12. Any payments made hereunder to the Player, for a period during which he is entitled to workmen's compensation benefits by reason of temporary total,

---

**36.** Brief for Appellee-Cross-Appellant James McCoy (Yazoo) Smith at 56–58.

**37.** 593 F.2d at 1189 n.70.

**38.** Order of January 1, 1976.

**39.** *See* note 31.

**40.** 420 F.Supp. at 749.

**41.** Brief for Appellee-Cross-Appellant James McCoy (Yazoo) Smith at 53–55A.

**42.** 593 F.2d at 1190.

**43.** 593 F.2d at 1176–77; 420 F.Supp. at 748 n.8.

permanent total, temporary partial, or permanent partial disability shall be deemed an advance payment of workmen's compensation benefits due the Player, and the Club shall be entitled to be reimbursed the amounts thereof out of any award of compensation.[44]

Thus, it appears that the $19,800 paid to Smith should not have been included in calculating the total compensation he received from the Redskins because it was actually an independent workmen's compensation liability. However, when this case was originally before this court, Smith's workmen's compensation claim had not yet been resolved. Therefore, this court was not yet able to say that the $19,800 should not be included in the total compensation he received from the Redskins. There was no certainty that the Redskins would ever have a workmen's compensation liability to credit the payment against. Thus, the payment was included as compensation from the Redskins rather than as a part of the team's workmen's compensation liability.[45]

When this case was argued before the Court of Appeals, the facts had not changed. On these facts, the Court of Appeals agreed with this court that Smith's actual damages were reduced by the $19,800 payment.[46] However, the court clearly foresaw and disapproved of the possibility that if the workmen's compensation suit was resolved so that the Redskins were able to offset the $19,800 against their total liability, the Redskins would derive a double benefit—they would simultaneously reduce the workmen's compensation liability and the antitrust liability.[47] The Court of Appeals thus left for future proceedings the task of coordinating the two liabilities.

On June 5, 1978, while the Court of Appeals decision was pending, the Department of Labor issued a Memorandum of Informal Conference in which the hearing examiner recommended that the Redskins be permitted to credit the amounts paid to Smith against their liability pursuant to paragraph 12 of his contract. The parties agreed to this settlement.[48]

■ Since the Redskins have now benefited from their payment to Smith in the workmen's compensation settlement, it would be inconsistent with the opinion of the Court of Appeals and clearly unjust to permit the Redskins to continue to have their antitrust liability reduced after they have used that same payment to reduce their workmen's compensation liability. The court cannot allow the peculiarity of the timing of the decisions in this case and in the workmen's compensation suit to prejudice the plaintiff's right to accurate measurement of damages.

The defendants have directed the court's attention to the letter in which the parties agreed to settle the workmen's compensation suit. This letter was sent by the defendant's counsel and was signed and returned by the plaintiff and his counsel. In it, the plaintiff agreed to refrain from making any effort to use the outcome of the workmen's compensation matter to influence or affect the question of computation of damages in the pending antitrust case, then awaiting decision in the Court of Appeals, or in any other related legal proceedings.[49] This court has considered this issue and reached its conclusion without regard to the agreement of the plaintiff because

44. Plaintiff's Exhibit 1, *reproduced in* J.A. 198.

45. 420 F.Supp. at 748 n.8.

46. 593 F.2d at 1190 & n.75.

47. *Id.* at 1190 n.75. The footnote reads in full: 75. Plaintiff's "actual damages" obviously were reduced by the $19,800 that he actually received, and his actual receipt of this sum cannot be ignored on the speculative chance that the Redskins may claim and be allowed it as an offset to an unrelated and as yet

undetermined liability. The fact that the Redskins have derived a benefit from their payment of this sum in this case, of course, may prevent them, on some sort of estoppel theory, from deriving a second benefit from it in the workmen's compensation suit; but that is of no concern to us here.

48. Letter of August 21, 1978 from Lawrence Lucchino to R. Kenneth Mundy.

49. *Id.*

basic fairness and the logic of the opinion of the Court of Appeals require it. The Court of Appeals did not want the defendants to get a double benefit from the payment. Given the result reached in the workmen's compensation issue, it was incumbent upon this court to prevent the defendants from receiving more benefit from that payment than is just.[50]

### V. Conclusion

The plaintiff has presented no convincing arguments that he would have been able to negotiate a contract with multi-year injury protection or that he would have been able to negotiate a more lucrative one-year contract than did Pat Fischer. Therefore I find that had there been no draft, Smith would have earned $54,000 for his one year in the NFL. Since his actual compensation other than workmen's compensation was $50,000, his damages were $4,000.

█ The plaintiff has asked for prejudgment interest on any damages he is awarded. In many situations, prejudgment interest can be awarded in cases arising under federal law.[51] In those situations, whether to award prejudgment interest is left to "the sound discretion of the district courts."[52] However, in antitrust cases, the plaintiff receives *treble* damages by statute. Prejudgment interest is thus not needed in addition to treble damages to compensate the plaintiff for his injuries and should not be awarded.[53]

Recently, Congress has amended § 4 of the Clayton Act, 15 U.S.C. § 15, to authorize the award of prejudgment interest in certain situations.[54] Congress was aware that existing law did not give clear authority for awarding prejudgment interest.[55] It gave courts the authority for the purpose of providing a disincentive for litigants to use delaying tactics.[56] However, the amendment does not help the plaintiff because § 4(b) of the Antitrust Improvements Act states that the amendment applies only to actions commenced after its passage.

Therefore, a judgment will be entered awarding the plaintiff $12,000.[57]

---

**50.** While the court is satisfied that the facts compel this result, it is at the same time skeptical of the propriety of counsel's affidavit to the effect that his agreement was tied solely to the proceedings in our Court of Appeals. The clear language of the stipulation will not accommodate such a restricted interpretation.

**51.** *Lodges 743 and 1746 v. United Aircraft Corp.*, 534 F.2d 422, 446 (2d Cir. 1975).

**52.** *Id.*

**53.** *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 80 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed. 577 (1973); *Locklin v. Day-Glo Color Corp.*, 429 F.2d 873, 877 (7th Cir. 1970); *Vandervelde v. Put and Call Brokers and Dealers Association*, 344 F.Supp. 118, 157 (S.D.N.Y.1972); *Cape Cod Food Products v. National Cranberry Association*, 119 F.Supp. 900, 911 (D.Mass.

1954). *Accord, Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 638 F.2d 661, 663 (3d Cir. 1981).

**54.** Antitrust Improvements Act, Pub.L.No.96–349, § 4(a)(1), 94 Stat. 1156 (Sept. 12, 1980).

**55.** H.R.Rep.No.96–875, 96th Cong., 2d Sess. 5 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 2716, 2766, 2769.

**56.** H.R.Conf.Rep.No.96–1234, 96th Cong., 2d Sess. 9 (1980), *reprinted in* 1980 U.S.Code Cong. & Ad.News 2781, 2783.

**57.** Since this case is decided in response to the plaintiff's motion for recomputation of damages, it is not necessary to decide whether the plaintiff's motion for summary judgment complies with the requirements of the local rules.