**James McCoy (Yazoo) SMITH, Plaintiff,**

v.

**PRO–FOOTBALL et al., Defendants.**

**Civ. A. No. 1643–70.**

United States District Court, District of Columbia.

Sept. 8, 1976.

**740**

Stuart H. Johnson, Jr., R. Kenneth Mundy, Washington, D. C., for plaintiff.

Robert B. Frank, Washington, D. C., for defendant Pro-Football.

James C. McKay, Paul J. Tagliabue, C. Michael Buxton, Covington & Burling, Washington, D. C., for defendant National Football League.

## OPINION

BRYANT, District Judge.

In this action, which was tried to the Court, plaintiff seeks to recover treble damages under the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15. No disputes exist as to any jurisdictional or procedural questions. The defendants are Pro-Football, Inc., better known as the Washington Redskins, and the National Football League, the unincorporated association of major league professional football teams in the United States. There is no dispute that the defendants are engaged in substantial interstate commerce as well as national telecasts of their football games.

■ The plaintiff, James McCoy (Yazoo) Smith, was an All-American college football player at the University of Oregon, from which he graduated in 1968. He was "drafted" by the Redskins in the league's annual player selection draft in January, 1968, as their first round choice. He was the twelfth player in the nation to be drafted that year. After some negotiations, in which he was represented by an agent, plaintiff on May 11, 1968 signed a one-year contract with the Redskins, the Standard Player Contract required by the NFL Constitution and By-Laws to be signed by all players. Plaintiff, who was expected to become one of the finest defensive backs ever to play professional football, received a contract calling for the payment of a $23,-000 "bonus" for signing, an additional $5,000 if he made the team, and a salary of $22,000. He made the team easily, and performed at a very high level during his first season of play. Unfortunately, his career was abruptly terminated when he received a serious neck injury in the final

game of that 1968 season. In those causes of action which have survived to trial, plaintiff asserts that he was damaged in his business or property, i. e. his ability to market his unique skills, by the combinations and agreements of the defendants contained in the NFL Constitution and By-Laws and commonly known as the player selection draft, with its attendant effectuating restrictions.[1] The essence of these contentions is that because of the draft, which plaintiff argues constitutes a group boycott under the antitrust laws, he was unable to negotiate a contract reflecting the free market or true value of his services, and unable to negotiate a contract containing adequate guarantees against loss of earnings in the event of injury.

The mechanics of the NFL draft are not complex. The order of choosing is determined by the teams' playing record in the season just ended, with the team with the poorest winning percentage picking first, the team with the second-worst winning percentage picking second, and so forth. The winner of the Super Bowl (the league championship game) picks last, and the runner-up in the Super Bowl picks second-last. Each team has one choice in each round of the draft (unless it has traded its choice in that round to another team), and there are seventeen rounds in each yearly draft. At the time of plaintiff's selection by the Redskins, there were twenty-six teams choosing in the draft. Through various restraints imposed by the NFL Constitution and By-Laws, no team is permitted to negotiate prior to the draft with any player eligible to be drafted, and no team may negotiate with (or sign) any player selected by another team in the draft. Future draft choices may be traded by any team, and commonly are so traded. The net result of these restrictions is that the right to negotiate

with any given player is exclusively held by one team at any particular time, and if the player cannot reach a satisfactory agreement with the team holding the rights to his services he cannot play in the NFL (unless of course he is traded to another team and signs with that team). Upon reaching an agreement with a team, each player is required to sign a National Football League Standard Player Contract containing various provisions, among which is a pledge to honor and obey the rules contained in the NFL Constitution and By-Laws. Each player may also sign a supplemental agreement with the team embodying any additional compensation and benefit features which he has negotiated with the team. As of March 5, 1968, the National Football League Players Association became the exclusive bargaining agent and representative of the NFL players. This union executed its first collective bargaining agreement with the NFL owners in November of 1968; that agreement has since expired, and the union and the owners have been unable to reach another agreement to date.

## I. THE LABOR LAW EXEMPTION

The defendants argue that the NFL draft is a subject of mandatory collective bargaining between the league and the NFL Players Association, the collective bargaining agent of the players, and is therefore exempt from review under the antitrust laws by virtue of the so-called "labor law exemption". For the reasons which follow, the Court holds that this exemption does not bar a recovery by plaintiff in this case.

### A.

■ As defendants argue, there is indeed a labor law exemption from the cover-

---

1. Defendants have contended that the relevant market in this action is the United States and Canada, i. e. the NFL and the Canadian Football League. The Court finds as a fact that the Canadian Football League in 1968 did not offer significant competition for the services of outstanding American college football players also selected in the NFL draft, due to its limits on Americans permitted on CFL teams, its lack of

attraction or glamor for the athletes, and the differences in the nature and rules of the football played there. Accordingly, the Court holds that the relevant market for this action is professional major league football in the United States. In 1968 (and at present) the National Football League was the sole source of purchasers of the product which plaintiff sought to market.

age of the antitrust laws for certain arrangements resulting from collective bargaining agreements between employers and employees. This doctrine, the precise contours of which are neither clear nor entirely coherent, has been elucidated by the Supreme Court primarily in four leading cases: *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); *Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); *Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); and *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); See also *Connell Construction Co. v. Plumbers & Steamfitters*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). While these cases do not leave the precise manner of applying the doctrine to the circumstances of professional football entirely free from doubt, they do establish rules and guidelines clearly dispositive of defendants' contentions in this case. First, the cases provide no support whatever for the league's argument that arrangements related to mandatory subjects of collective bargaining, prior to their embodiment in an agreement, fall within the exemption merely because they relate to mandatory subjects. A reading of Mr. Justice Goldberg's concurring opinion in *Jewel Tea, supra* at 697, upon which defendants rely for this notion, makes clear that his arguments all assume the existence of a collective bargaining agreement, and cannot be read in any reasonable fashion as support for the league's argument in this regard. Moreover, the Court's opinion in *Pennington*, from which Justice Goldberg's concurrence in *Jewel Tea* also serves as a dissent, specifically states that an agreement resulting from union-employer negotiations is not "automatically exempt from Sherman Act scrutiny simply because the negotiations involve a compulsory subject of bargaining, regardless of the subject or the form and content of the agreement." *Pennington, supra*, 381 U.S. at 664–665, 85 S.Ct. at 1590. A fortiori, if a completed agreement is not exempt from antitrust scrutiny, then a mandatory subject upon which an agreement has not yet been concluded cannot be exempt. And in any event, it seems apparent that the policy of the exemption—allowing the collective bargaining process, proceeding unfettered by antitrust restraints, to determine wages, hours, and terms and conditions of employment—does not require and would not be served by extending the exemption to arrangements imposed unilaterally by employers, merely because such arrangements could at some time be settled upon through mandatory collective bargaining. Indeed, the thrust of the cases is quite the opposite: a scheme advantageous to employers and otherwise in violation of the antitrust laws cannot under any circumstances come within the exemption unless and until it becomes part of a collective bargaining agreement negotiated by a union in its own self-interest. Defendants' argument that plaintiff was not entitled to the protection of the antitrust laws must therefore fail, since the plaintiff entered into his contract with the Redskins prior to the time when the league and the players association (acting as exclusive bargaining agent for the players) reached their initial collective bargaining agreement. And finally in this regard, even if the exemption were viewed as having become operative as to all mandatory subjects of collective bargaining at the first moment there was an exclusive bargaining agent representing the players with respect to those subjects, plaintiff's recovery here would still not be barred. The NFL Players Association did not become the exclusive bargaining agent for purposes of the labor law exemption until March 5, 1968, when it signed a recognition agreement with the league. Plaintiff however was drafted in January of 1968, and it was at that time that the restraints of the draft and related rules were imposed upon him. His cause of action therefore accrued before the exemption could under any view of the law have been considered operative.

B.

■ Even assuming for purposes of argument that the draft had been embodied in a

collective bargaining agreement covering a period early enough to make possible the operation of the exemption with respect to plaintiff's antitrust claims—which it clearly was not—this would not automatically immunize the draft and the league from antitrust liability.[2] First, it would have to be shown that the draft constitutes an agreement on mandatory subjects of bargaining. While the issue is not wholly free from doubt, it does appear to the Court that the matters inherent in the draft would constitute such subjects. In general, those subjects include wages, hours, and other terms and conditions of employment. It is clear that the union and the teams could collectively bargain all monetary compensation, benefits, incentives, and guarantees to be paid to first-year players as mandatory subjects. In light of the acceptance of such practices as the hiring hall, see *Teamsters Local v. NLRB*, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), and seniority as determinants of the structure of the labor market in a particular industry and of the opportunity for employment in a given place at a given time, it seems probable that each feature of the draft as to which plaintiff raises antitrust objections would also be considered a term or condition of employment. See also, Jacobs & Winter, Antitrust Principles and Collective Bargaining By Athletes: Of Superstars in Peonage, 81 Yale L.J. 1, 16 (1971). Once it has been established that the draft flows from mandatory subjects of bargaining, the cases cited above also require that it have been arrived at as a result of genuine, arms-length bargaining, and not have been "thrust upon" a weak players union by the owners. See also, *Flood v. Kuhn*, 407 U.S. 258, 288, 295, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972) (dissenting opinion of Marshall, J.). The league contends that the 1968 and subsequent collective bargaining agreements, incorporating the NFL Constitution and By-Laws (which contain the provisions and procedures for the draft) reflect an agreement of the sort required. This issue would

have to be explored at trial in an appropriate case.

One final set of issues would be relevant in such a trial. In each of the leading cases (cited above) subsequent to *Hutcheson*, the challenged collective bargaining agreement worked to the disadvantage of the competitors of management. The doctrine of those cases is to the effect that even when an agreement is related to mandatory subjects, it must be examined to determine if it is: (1) An employers' combination/conspiracy, in which the union has acquiesced, whose purpose is to fix prices, allocate markets, or drive competitors from the market (i. e., an attempt to monopolize). Such an agreement does not fall within the exemption, see *Allen Bradley, supra.* (2) A joint management-union combination/conspiracy to accomplish those objectives, in which the union and management interests appear to coincide. Such an agreement must be scrutinized for its relative impact on the product market and the interests of union members, in light of national labor and antitrust policies. (3) The result of the union's own efforts in its self-interest, free of any agreement with or among the employers to attempt to accomplish those objectives. Only the third kind of collective bargaining agreement on mandatory subjects has been given an unqualified exemption from the antitrust laws subsequent to *Jewel Tea* and *Pennington*. In the present case, two additional factors complicate the analysis that would have been required should this issue have been appropriate for trial. First, unlike the collective bargaining agreements under challenge in the leading cases, an agreement containing the draft would work not to the disadvantage of the competitors of the employers but rather to the detriment of potential employees, persons neither party to the agreement nor members of a union which is party to the agreement. Secondly, the draft itself, if not within the exemption, would constitute a *per se* violation of the antitrust laws, as will be seen

---

**2.** Because the Court determined, for the reasons set forth in part I(A), *supra*, that the exemption could not apply in the circumstanc-

es of this case, it was unnecessary to receive evidence at trial with respect to the issues discussed in part I(B) hereof.

below, yet is not one of the proscribed objectives specifically enumerated by the prior cases.

While a group boycott such as the NFL draft is not one of the objectives of collective bargaining agreement heretofore specifically proscribed, it does share many characteristics of such anticompetitive practices, and is one of those practices "at the core of the type of anticompetitive commercial restraint at which the antitrust laws are directed," *Jewel Tea, supra,* 381 U.S. at 733, 85 S.Ct. at 1626 (concurring opinion of Goldberg, J.). It seems likely, therefore, that in a situation comparable to *Allen Bradley* or even *Pennington* a group boycott would be held to be a proscribed objective of such an agreement.

With regard to the fact that the boycott's impact is on potential employees rather than on competitors of the employer, however, the Court believes that the policies of the labor laws require that such an agreement be found to be within the scope of the exemption to the antitrust laws. First, as Justice Goldberg points out in his concurring opinion in *Jewel Tea,* the central thrust of the antitrust statutes is directed towards protecting the functioning of a free product market from concentrations of economic power in the hands of trusts and employers. While these laws also (absent the exemption) protect a talented football player from a boycott by the team owners, such protection is somewhat less central to the objectives of the antitrust laws. Secondly, it is quite central to the purposes of the labor laws to allow unions to arrive at bargains that they consider in their best interests with respect to wages, hours, and other terms and conditions of employment. Indeed, this is the very rationale of the exemption itself. Therefore, accommodating the competing antitrust and labor law policies as the Supreme Court cases require, it would appear that if such a bargain has been concluded as the result of "bona-fide, arm's-length bargaining in pursuit of [the union's own] policies, and not at the behest of" nonlabor groups, it is exempt from the antitrust laws. See, *Jewel Tea, supra,* 381

U.S. at 690 and n. 5, 85 S.Ct. at 1602. In other words, given a determination of the union that negotiation of a draft is important to it and the fairly clearly mandatory bargaining nature of the draft's inherent issues, the accommodation required by *Jewel Tea, supra* at 689, 85 S.Ct. 1596, of labor and antitrust policies, in light of the impact of the boycott on a market less central to the antitrust laws than the product market present in *Allen Bradley, Pennington,* and *Jewel Tea,* the fact that the boycott device is agreed upon in combination with nonlabor groups (i. e. the team owners) does not remove it from the scope of the exemption. See generally Justice Goldberg's concurring opinion in *Jewel Tea, supra,* and *Jacobs & Winter, supra.*

## II. THE ANTITRUST ISSUES

### A.

█ Throughout this case, plaintiff has contended that the NFL draft and surrounding restrictions constitute a *per se* violation of the Sherman and Clayton Acts, as interpreted by established precedent. In light of the evidence adduced at the trial of this matter, the Court can only conclude that plaintiff's contention must prevail, and accordingly holds that the NFL draft in which plaintiff was selected violates the Sherman and Clayton Acts *per se,* and that plaintiff is therefore entitled to recover treble damages for any loss arising out of the imposition of those restrictions upon him.

█ The essence of the draft is straightforward: the owners of the teams have agreed among themselves that the right to negotiate with each top quality graduating college athlete will be allocated to one team, and that no other team will deal with that person. This outright, undisguised refusal to deal constitutes a group boycott in its classic and most pernicious form, a device which has long been condemned as a *per se* violation of the antitrust laws. *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Radiant Burners, Inc. v. Peoples Gas Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's Inc. v.*

*Broadway Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators Guild v. F. T. C.,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). There is no question but that the restrictions comprising the draft "are naked restraints of trade with no purpose except stifling of competition", *White Motor Co. v. United States,* 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); indeed, the owners attempt to justify its use by claiming that the league could not survive the competition for the services of the premier players that would ensue in its absence. But "[e]xclusion of traders from the market by means of combination of conspiracy is so inconsistent with the free-market principles embodied in the Sherman Act that it is not to be saved by reference to the need for preserving the collaborators' profit margins or their system [of organizing their distribution operations] . . .", *United States v. General Motors Corp., supra,* 384 U.S. at 146, 86 S.Ct. at 1331. Like any other organizations, the teams of the National Football League are subject to the antitrust laws, *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), the team-sport or joint-venture nature of their operations notwithstanding. None of the cases cited by defendant, in urging that the draft does not violate these laws, suggests in any way that such direct, explicit, and purposive restraints on competition as those which characterize the draft can escape from *per se* rule much less be found reasonable. See *Chastain v. American Telephone and Telegraph Co.,* 401 F.Supp. 151 (D.D.C., 1975); *Worthen Bank & Trust Co. v. National Bank-Americard,* 485 F.2d 119 (C.A. 8, 1973). cert. den., 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974); *McQuade Tours Inc. v. Consolidated Air Tour Committee,* 467 F.2d 178 (C.A. 5, 1972), *cert. den.,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973); *Bridge Corp. of America v. American Contract Bridge League, Inc.,* 428 F.2d 1365 (C.A. 9, 1970), *cert. den.,* 401 U.S. 940, 91 S.Ct. 940, 28 L.Ed.2d 220 (1971).

**B.**

Defendants have contended throughout this case that, if the case is governed by the antitrust laws at all, the *per se* rule is inapplicable, and the draft is within the permissible limits of the Rule of Reason first announced in *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). While the Court has already determined that the naked restraints of the group boycott present in this case preclude the application of the Rule of Reason, even its application would not save defendants from liability for the operation of the draft. In order for the draft to be found lawful under the Rule of Reason, the Court would have to find that it is a reasonable way of pursuing legitimate business interests, and that it does not have the purpose or effect of unreasonably restraining competition. The defendants have attempted to establish at trial that the draft fits within these criteria. Their central argument is that the draft, as well as other NFL rules such as the Rozelle Rule,[3] are indispensable in maintaining what they term "competitive balance", without which the league could not succeed in attracting spectator interest. Competitive balance means in essence that all of the league's teams are of sufficiently comparable playing strength that football fans will be in enough doubt about the probable outcome of each game and of the various division races that they will be interested in watching the games, thus supporting the teams' television and gate revenues. According to the defendants' witnesses, competitive balance sufficient to achieve this end could not be maintained in the league in the absence of a system of player allocation; the draft, they contend, allocates new player talent reasonably evenly among the league's teams. According to the defendants' arguments, if a free market for player talent existed today in professional football, the league's current competitive balance would be irretrievably destroyed as the more tal-

---

3. The full panoply of restrictive league rules is described in *Mackey v. National Football League,* 407 F.Supp. 1000 (D.Minn., 1975).

ented players migrated to the cities with the richest teams/owners, to the "glamor" cities such as New York, Los Angeles, and Miami, and to the teams with the best winning records. According to this argument, the owners of the NFL franchises in Los Angeles, Kansas City, Dallas, and Detroit do not care if they lose money on the operation of their teams, as long as they win games, i. e. they do not conform to the principles of economic decision-making upon which the antitrust laws are premised. Defendants further argue that these owners would persist in this course of action, buying up all the best talent available, until they destroyed the league's viability. Finally, defendants contend that the draft is effective as a key element of maintaining a balance of player talent throughout the league.

The evidence on these points was at best equivocal. On the one hand, the Court is persuaded that in a free market for college players the wealthiest owners would indeed make an effort to buy up as much player talent as possible, and that factors such as the relative glamor of the cities and the playing-field success of the teams would influence player choices in favor of signing with such teams. On the other hand, there was abundant convincing testimony that many other factors play significant, often decisive roles in the desires of players to play in one city as opposed to another, and even the factors cited by the owners often appear to work at cross purposes with each other. More importantly, the defendants were unable to produce any credible evidence of a significant correlation between the opportunity to draft early in the draft (i. e. the preferred position) and improvement in team performance. In fact, the defendants' evidence in this regard indicates a correlation too low to be regarded as supporting their claim that the draft is essential to the survival of the league. For example, despite the existence of all the league's restraints on player movement, in the last three seasons nine teams have captured 22 of the 24 spots available in the playoffs leading to the Super Bowl. This shows neither competitive balance in division races nor effectiveness of drafting by early-selecting teams.[4] Finally, the defendants presented no experiential evidence whatever to substantiate their claim that in the absence of player movement restrictions the best players would move to the small group of teams offering money, glamor, and success. Indeed, the little empirical evidence available with regard to the movement of free agents and former World Football League players since the 1975 season ended does not show any such trend.[5]

In any event, the Court need not fully evaluate the league's claims of necessity for a college draft because, even conceding the need for some such system, the current structure is significantly more restrictive than necessary. In fact, the current system is absolutely the most restrictive one imaginable. It leaves no room whatever for competition among the teams for the services of college players, and utterly strips them of any measure of control over the marketing of their talents. Because significantly less restrictive alternatives are available, the current system cannot be held to be protected by the Rule of Reason.

Questioning of most of defendants' witnesses, both on direct examination and by the Court, indicated fairly unanimous support for the proposition that in each crop of college players there are five to ten "blue chip" or virtually certain "all-pro" players, and another thirty to fifty players who will almost certainly make the team and have a good chance of making the starting lineup in their first year. The evidence also showed that the coaching staffs of the teams and the scouts employed by the four scouting combines serving some of the teams are able to identify these players with a high degree of agreement among themselves. The witnesses also testified that the value of the draft depends upon its

---

4. See, *New York Times,* June 6, 1976, p. S6, "NFL Owners Will Take Up Cut in Player Limit".

5. See, *Washington Post,* July 7, 1976, p. D1, "Free Agents' First Wave On the Move".

predictive power, i. e. it can only distribute player talent if it can identify that talent. Given this predictive power, and given the principle purpose of the draft to distribute the *top* player talent, a less restrictive alternative than the present system would be to hold a draft consisting of just two "rounds". This would allocate the players generally considered to be the most talented, but would permit competition for the services of all other players. Since there are presently seventeen rounds in the draft, with twenty-eight teams picking in each round, a reduction of fifteen rounds would obviously be significantly less restriction on competition than the present system.[6]

Another alternative drafting system shown by the evidence to be a possible acceptable method of player distribution is to allow more than one team to draft each player, while restricting the number of players any one team might sign. This alternative, not incompatible with the previous example, might for example have a draft of the current seventeen rounds, with each player to be drafted by as many as three teams, but with a requirement that a given team could sign only one player from each round. Obviously a number of variations on this theme are possible, but the significant point is that any variation on these examples would allow much more of a free market system for determining new-player salaries than is currently the case (or was the case in 1968, when the plaintiff was drafted). What is important to note is that the owners are wholly cognizant, and indeed virtually concede, that the current system results in lower salaries for some players than they would receive in a free market, and that they have taken no action whatever to attempt to reduce the maximally restrictive restraints imposed by the current system of player selection. Therefore, in light of the near-certainty that less restrictive alternatives are available to meet the alleged player distribution needs of the league, the current system cannot be

regarded as "reasonable" within the meaning of the antitrust laws.

C.

■ The damages suffered by plaintiff cannot be calculated exactly, since there is and has been no free market with which to measure the value of players' services. In such a case, however, a reasonable estimate of damages must be made. *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *Espaillat v. Berlitz Schools Of Languages Of America, Inc.*, 127 U.S.App.D.C. 293, 383 F.2d 220 (C.A.D.C.,1967). In this case, a reasonable estimate may be made with a fair degree of logic and precision.

The premise with which this estimate starts is that plaintiff Smith was a "blue chip" player. The testimony without exception showed that he was one of those few college players confidently expected to become an "all-pro", and to start in his first year. His actual performance fulfilled those expectations. The Court has also concluded on the basis of all the evidence that the elimination of the draft would benefit primarily the most talented players, such as the plaintiff, who would then have considerably more bargaining leverage than players now selected on lower draft rounds. The salaries of these players could therefore be expected to increase from their current levels in a free market situation. These conclusions indicate that a fair minimum estimate of the value of plaintiff's services may be found by looking at the compensation received by other top players in the league at that time, particularly those playing his position or with the Redskins. In addition, it would be useful to look at compensation paid to players who were signed by the Redskins as free agents at that time, although it is true that the free agent market may be artificially high because of the restrictions binding most of the other players in the league at any one time. Also instructive would be the compensation re-

**6.** The Court does not intend that these examples be regarded as necessarily being within the Rule of Reason; they are, rather, examples of less restrictive alternatives to the present system, and meant to show that the present draft is not a reasonable system.

ceived under the Rozelle Rule by teams losing free agents, if such players were comparable to plaintiff.

█ The evidence showed unequivocally that top players at that time were being offered long-term contracts by some teams, including at times the Redskins. The Court concludes that a player of plaintiff's talent would certainly have been able to negotiate a three-year contract on very favorable terms in the absence of the restraints imposed by the owners. The evidence also showed that such players were able to negotiate contracts which guaranteed payment for the full term of the contract even if the player were injured ("fully vested contract" or "injury protection clause"). On the basis of the evidence of the contracts being negotiated at times elsewhere in the league and by the Redskins during the relevant period, and considering that such protection was shown to be of great concern to players of plaintiff's caliber, the Court also concludes that plaintiff would have been able to include such injury protection in a long-term contract had it not been for the illegal restraints imposed upon him. The defendants have argued and tried to show at trial that Mr. Smith's failure to negotiate such a contract on favorable terms resulted from shortcomings of his negotiating agent, rather than from the draft system. Plaintiff has argued that there was a conspiracy among the owners to prevent the negotiation of injury protection clauses in particular. While the evidence does not sustain the contention that there was any understanding among the owners, overt or covert, that such clauses were not to be included in player contracts, neither does it sustain the contention that plaintiff's failure to secure such protection stemmed from causes whol-

ly apart from the draft. While it is true that other players coming into the league at that time were able to negotiate such protection, and while the Redskins offered a long-term contract to their first draft choice the prior year, the testimony showed that the team had made a policy decision to resist offering such contracts at high pay levels to its 1968 draft selections. The only finding consistent with the evidence in this case is that, although plaintiff's agent was perhaps not as effective as he might have been, the primary reason that he was unable to negotiate a long-term contract with injury protection and other favorable terms was that he had been stripped of the bargaining power inherent in a free market, a market to whose advantages he was legally entitled. Consequently, the Court holds that plaintiff's damages are the difference between what he would have earned under a three-year contract containing an injury protection clause [7] and what he was actually paid by the Redskins.[8]

The Court has already discussed certain criteria which could be used to arrive at an approximation of what plaintiff would have earned in a free market. Almost all of these indicators are found in the circumstances surrounding the signing of defensive back Pat Fischer by the Redskins. Fischer was recognized as an outstanding defensive back (plaintiff's position), and had twice been chosen to play in the Pro Bowl (i. e. he was "all-pro") during his first eight seasons with the St. Louis Cardinals (1960–1967). In the 1967 season he played out his option, and in 1968 signed a two-year, no-cut contract with the Redskins for the 1968 and 1969 seasons. He was compensated under that contract in the amounts of $30,-000 salary for each year and a $48,000 addi-

---

7. Some top round draft selections were able to negotiate contracts of more than three years, some had injury protection, some had astronomical bonuses, salaries, or other benefits, and some did not negotiate multi-year agreements. The Court finds a three-year fully vested contract, at the salary described in the text below, to be a fair estimate of a free market outcome for a person of plaintiff's talents in his playing position at that time.

8. In addition to a total of $28,000 bonus and $22,000 salary compensation, the Redskins paid plaintiff $19,800 in the season following his injury (the standard option-year pay of 90% of the prior year's salary). This sum of $69,800 is the total compensation paid to plaintiff by the team, and is the benchmark for comparison with his free-market value for purposes of computing damages.

tional sum, denominated as a "bonus"[9], for the two year period. The Cardinals sought compensation from the Redskins for the loss of Fischer's services, claiming under the Rozelle Rule that they were entitled to the contract of either the Redskins' premier receiver, Charley Taylor, or that of the plaintiff. The Redskins refused this request, and the matter had to be settled by Commissioner Rozelle under the Rule bearing his name. He determined that Fischer's services were not as valuable as those of either Charley Taylor or the plaintiff, and instead awarded the Cardinals compensation consisting of the Redskins' second round draft choice in 1969 and their third round draft choice in 1970. The Court has noted earlier that the compensation paid to Fischer when he was signed by the Redskins as a free agent is not a precise measure of his free market value, due to the comparatively few free agents in what was predominantly a player-movement-restricted market. On the other hand, Commissioner Rozelle—who is charged by the league with being expert in such matters—determined that plaintiff's services were worth more than Fischer's at that time. Whatever disparity results from the artificiality of the free agent market can therefore be neutralized for purposes of valuing plaintiff's free market worth by in effect setting off that inflation of price against the superior worth of plaintiff's services at that time. When these factors are netted out against each other, plaintiff's services are found to have been worth a total compensation of $108,-000 for a two year period. Translating this into the three-year term found appropriate as an estimate of the contract plaintiff could have negotiated in a free player market, the Court adds the proportionate share ($54,000) for the extra year, for a total three-year figure of $162,000. This is, incidentally, quite close to the $150,000 that plaintiff's agent testified (by deposition)

that he thought plaintiff should have been able to negotiate for a three year fully vested contract with the Redskins; the latter figure of course is premised on the lack of a free market at the time of the negotiations. Subtracting from the $162,000 that plaintiff's services would have brought in a free market the $69,800 he was actually paid, his actual damages amount to some $92,200. Judgment will accordingly be entered for treble damages in the amount of $276,600, plus the costs and attorneys fees (the latter to be submitted for approval of the Court) to which plaintiff is entitled under the Sherman and Clayton Acts.

9. The evidence at trial showed no consistent practice among the teams as to the allocation of total compensation for the contract period between salary and bonus. Plaintiff regards a bonus as being paid for the exclusive right to a player's services. This does not seem different than what the team receives in return for paying the player's salary, and for the purposes of this case salary and bonus can be regarded, together, as compensation for the value of whatever consideration is received by the team from the player for the contract period.