Gary ZIMMERMAN, Plaintiff,

v.

NATIONAL FOOTBALL LEAGUE, et al., Defendants.

Civ. A. No. 85–2392.

United States District Court, District of Columbia.

March 27, 1986.

James S. Kiles, James J. McDermott, O'Connor & Hannan, Washington, D.C., for plaintiff.

John H. Schafer, Paul J. Tagliabue, Sonya D. Winner, Covington & Burling, Washington, D.C., for NFL, NFLMC, Rozelle, Donlan, and teams.

Joseph A. Yablonski, Yablonski, Both & Edelman, Washington, D.C., for NFLPA and Upshaw.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

This proceeding involves a challenge under the federal antitrust laws to the "supplemental draft" conducted in April 1984 by the defendant National Football League ("NFL"). That draft affected players already under contract to professional football leagues other than the NFL. Plaintiff Gary Zimmerman, the third player chosen in the supplemental draft, is currently employed by the United States Football League ("USFL"). The named defendants, in addition to the NFL, are the 28 NFL member teams, NFL Commissioner Pete Rozelle, the National Football League Management Council ("NFLMC"), its Executive Director, Jack Donlan, the National Football League Players Association

("NFLPA"), and its Executive Director, Gene Upshaw.[1]

Zimmerman charges that the supplemental draft violates section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), because it allows him to negotiate with only a single NFL team. This, he claims, is an illegal restraint of trade in the form of a group boycott and concerted refusal to deal. He brings a private antitrust action seeking injunctive relief and treble damages under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

The parties have filed cross motions for summary judgment. The extensive record, including depositions and affidavits of the principal participants and the oral argument of counsel have been fully considered.

The Court determines that the plaintiff's claim must be denied. The labor exemption to the antitrust laws removes the supplemental draft from the restraints of the Sherman Act. Further, Zimmerman is unable to show that he was injured by reason of the alleged antitrust violation. Summary judgment will be granted to the defendants.

## BACKGROUND

The material undisputed facts are briefly stated. The 1984 supplemental draft was a response to the USFL's rapid emergence as a viable competitor to the NFL for the services of college football players preparing to enter the professional ranks. A number of star players signed contracts with USFL teams in early 1983 before the NFL's annual draft of college players took place.[2] These included the nation's top college player, 1982 Heisman Trophy winner, Herschel Walker. Some of these USFL players were also drafted in the NFL's regular college draft in the summer of 1983. Teams making such selections faced the risk that their choices would be wasted if the USFL survived and was successful.

By the spring of 1984, the USFL had signed contracts with approximately 100 college players from that year's graduating class, including the 1983 Heisman Trophy winner, Mike Rozier. Plaintiff Gary Zimmerman, considered one of the best offensive linemen in his class, was also signed to a contract. This greatly increased the number of players whose selection in the regular NFL draft would represent only an investment for the future, rather than providing immediately available talent for the drafting team. The NFL teams and NFL Commissioner Pete Rozelle became concerned that only the more successful organizations could afford to use their draft choices in this way.

Article XIII of the 1982 Collective Bargaining Agreement between the NFLMC and the NFLPA allows the NFL clubs to select a total of 336 players in the regular draft. No other restrictions on the methods or rules of the draft are specified. It was believed therefore that one or more rounds of the draft could be set aside solely for players already under contract to the USFL or other leagues. The teams preferred, however, to create additional draft rounds for USFL players. This proposed solution required union approval since it would increase the total number of players drafted.

On March 19, 1984, Jack Donlan raised the subject of a supplemental draft at a brief meeting with Eugene Upshaw. At the time, both men were in Honolulu, Hawaii for the NFL's annual meeting. Upshaw indicated that he would have to discuss the proposal with the Executive Committee of the NFLPA and its counsel, Richard Berthelson, and that the union would have to receive something in return for its approval. On March 22, 1984, the team owners authorized Donlan to continue discussions with Upshaw about the possibility of such a draft.

---

**1.** The NFLMC and the NFLPA since 1968 have been the collective bargaining representatives of the NFL teams and the NFL players, respectively.

**2.** The annual draft, referred to in this opinion as the "regular draft," is not challenged in this proceeding.

Meetings and discussions of this nature were not unusual. Indeed, prior to the meeting where the supplemental draft issue was raised, the two negotiators had met on other occasions to discuss a variety of issues that were in contention between the players' union and the league. The players were concerned that the team active player rosters, allowing 49 players per team in 1983, would be reduced to 45 players for 1984 as permitted by the collective bargaining agreement. In addition, the union felt that the league was violating Article XII of the agreement, which required copies of player contracts to be provided to the NFLPA. The NFLMC objected to providing the contracts because salary information had somehow been leaked to the press and to the USFL. Finally, a dispute was brewing concerning the league's contribution to the players' pension fund. The NFL believed that the fund was overfunded and that therefore its $12.5 million annual contribution would no longer be tax deductible. The union feared that the 1984 contribution might not be made.

Donlan and Upshaw had further discussions regarding the supplemental draft following their meeting in Hawaii. Berthelson and his counterpart, Sargeant Karsh, counsel to the NFLMC, also were consulted. On March 26, Upshaw discussed the issue with the Executive Committee of the NFLPA. That committee, without a formal vote, instructed Upshaw to accept the proposal if he was able to get something for it. The details of the supplemental draft agreement were worked out between Donlan and Upshaw in telephone conversations over the next few days. One area of disagreement was the number of selections that would be made. The NFL wanted four or five selections per team (rounds), while the union wanted two. On April 5, Donlan sent a proposed letter agreement concerning the supplemental draft to Upshaw. Changes to the proposal were suggested by Berthelson in a telephone conversation with Karsh. A revised agreement, dated April 11, was sent to Upshaw, who signed it for the NFLPA on April 19. The final agreement provided for three rounds or 84 selections.

At the same time that negotiations over the supplemental draft were taking place, Upshaw continued to press for the resolution of the roster size, player contracts, and pension contribution issues. At a meeting of the Retirement Board on April 18, the union and the NFL agreed to jointly submit a request for an IRS letter ruling that would resolve the question of the deductibility of the league's contribution to the pension fund. Upshaw assured Donlan in a telex of April 25, that the NFLPA would prohibit the dissemination of information from player contracts to the media or representatives of other professional football leagues. The telex indicated that Donlan had advised the union that the NFLMC would resume sending the contracts to the NFLPA when they were obtained from the individual teams.

With regard to roster size, the NFL team owners had already expressed a willingness at the March meeting in Hawaii to have 49 active player roster spots for the 1984 season. Hence, when Upshaw raised this issue as a possible exchange for the supplemental draft, Donlan responded that it was "doable." At a meeting held in Washington, D.C. in late May, the owners formally voted to maintain the 49 player limit. A letter agreement dated May 30, resolving this issue between the NFLMC and the NFLPA, was signed by Donlan and Upshaw.

The regular NFL draft was held on May 1; players already under contract to the USFL or any other professional league were ineligible for that draft. On June 5, the NFL supplemental draft was held. Gary Zimmerman was selected in the first round by the New York Giants; he was the third player chosen overall. Plaintiff played for the Los Angeles Express of the USFL in the spring 1984 and 1985 seasons. His representatives had contacts with the New York Giants in both years regarding the possibility of his signing with the Giants. This lawsuit was filed in July 1985.

## ANALYSIS

■ The parties have filed cross motions for summary judgment. To prevail on such a motion, the moving party must demonstrate that there are no material facts presenting a genuine issue for trial and that, as a matter of law, it is entitled to judgment. Fed.R.Civ.P. 56(c); *Goodrich v. Int'l Brotherhood of Electrical Workers*, 712 F.2d 1488, 1494 (D.C.Cir.1983). Once the movant has made a satisfactory showing of the absence of disputed material facts, it is incumbent upon the party opposing summary judgment to demonstrate through affidavits or references to materials already in the record that such facts do exist. Mere denials or conclusory allegations are insufficient to raise a genuine issue where the record does not support those allegations. *Briggs v. Goodwin*, 698 F.2d 486, 489 n. 2, *rev'd on rehearing on other grounds*, 712 F.2d 1444 (D.C.Cir. 1983).

While the plaintiff "denies" many of the facts alleged by the defendants as not in dispute, his counsel has failed to convince the Court, through affidavits or other record evidence, that a genuine issue remains as to material facts.[3] Summary judgment must be granted to the defendants on two alternative grounds: (1) the supplemental draft is immune from attack under the "labor exemption" to the antitrust laws; and (2) plaintiff has not been injured by reason of the alleged violation of the antitrust laws, and thus has failed to satisfy an important element of his cause of action.

3. Zimmerman pursued extensive discovery prior to the hearing on the summary judgment motions, including depositions of NFLMC and NFLPA personnel. The NFL's objection to release of certain player contracts was sustained since such discovery would be relevant only to the issue of damages. Apart from that one restriction, the plaintiff had every opportunity to develop the record.

4. The non-statutory labor exemption is to be contrasted with the "statutory" exemption. The latter arises under certain sections of the Clayton Act, 15 U.S.C. § 17; 29 U.S.C. § 52, and the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105, 113. Those provisions exempt various activities of labor organizations from antitrust scrutiny.

## I.

■ From the outset, the parties have agreed that an immediate threshold issue is the applicability to the supplemental draft of the so-called non-statutory labor exemption to the antitrust laws.[4] Developed through a series of Supreme Court decisions,[5] the exemption reflects an attempt to accommodate the sometimes competing or contradictory policies underlying the nation's labor and antitrust laws. The exemption reflects a national policy encouraging collective bargaining over wages and working conditions between employees and employers, despite its likely detrimental effect on price competition among employers. *Connell Construction Co. v. Plumbers & Steamfitters, Local Union 100*, 421 U.S. 616, 621–23, 95 S.Ct. 1830, 1834–35, 44 L.Ed.2d 418 (1975).

■ The elements of the labor exemption were articulated in *Mackey v. National Football League*, 543 F.2d 606 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). That decision is of particular relevance because it deals with the somewhat unique labor and product markets of professional sports. In *Mackey* the court fashioned a three part test from earlier Supreme Court decisions on the labor exemption: (1) The trade restraint must affect primarily only the parties to the collective bargaining relationship; (2) the agreement must concern a mandatory subject of collective bargaining;

The exemption is available only when a union acts in its own self interest and does not combine with non-labor groups. *United States v. Hutcheson*, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941).

5. *Connell Construction Co. v. Plumbers & Steamfitters, Local Union 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975); *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Local Union 189, Amalgamated Meat Cutters and Butcher Workers v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); *Allen Bradley Co. v. Electrical Workers*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945).

and (3) the agreement must be the product of *bona fide*, arm's-length bargaining. 543 F.2d at 614. The parties are in agreement that this test should govern the Court's analysis of the supplemental draft and that the second part of the test is satisfied.

## A.

Before turning to the first and third prongs of the *Mackey* test, a preliminary issue warrants discussion. Contending that the procedures provided in the NFLPA's constitution for amending the collective bargaining agreement were not followed, plaintiff argues that the supplemental draft is void and therefore cannot be immune from the antitrust laws under the labor exemption. In response, the NFLPA attempts to demonstrate that the proper procedures under its constitution were followed, especially given the history of mid-term adjustments to the parties' collective bargaining agreement and their customary practice of formalizing in letter agreements the results of such negotiations.

■ It is unnecessary to pursue an in-depth analysis of the union's constitution and prior negotiating practices of the parties to resolve this question. The labor exemption is based on the policies underlying the labor laws, but the validity of an agreement under those laws is a separate question from the applicability of the labor exemption. Further, to qualify for the exemption, the understanding between the parties need not be contained in a formal collective bargaining agreement.

These propositions find support in *Connell*. That case involved an antitrust challenge to an agreement between a union and a building contractor providing that only companies having current collective bargaining agreements with the union would be awarded subcontracts. The union did not seek to represent the contractor's employees, but instead was attempting to put pressure on non-union subcontractors. The Court first considered the union's argument that the agreement was immune from antitrust scrutiny under the labor exemption and held the exemption did not apply. 421 U.S. at 625, 95 S.Ct. at 1836. It then went on to reject the union's claim that the agreement was specifically permitted by a proviso to section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), in effect ruling that the agreement was an unfair labor practice and therefore null and void. *Id.* at 626–34, 95 S.Ct. at 1837–41.

If the Supreme Court had followed the analysis suggested by Zimmerman's counsel, it would have first determined that the agreement in question violated the labor laws and then simply stated that the labor exemption was inapplicable to such an agreement.[6] Alternatively, it could have held that the labor exemption was available only to valid collective bargaining agreements. Instead, after undertaking an extensive analysis of the effect of the agreement, the Court simply noted that since there was no collective bargaining agreement between the union and Connell Construction Co., the policy favoring collective bargaining "offer[ed] no shelter for the union's coercive action." *Id.* at 626, 95 S.Ct. at 1837.[7] Thus, the plaintiff's view of the labor exemption is unsupported by the approach of the most recent Supreme Court case developing the exemption.

Plaintiff relies on the following language from the opinion of Senior Judge Bryant in *Smith v. Pro Football, Inc.*, 420 F.Supp. 738 (D.D.C.1976), *aff'd in part and rev'd*

---

**6.** This possibility was implicitly rejected by the Second Circuit in a case subsequent to *Connell*. *See Commerce Tankers Corp. v. National Maritime Union of America*, 553 F.2d 793, 801–02 (2d Cir.) *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977) (labor exemption issue not necessarily controlled by prior determination that agreement violated § 8(e)).

**7.** Plaintiff's argument is actually weaker than the argument that might have been made in *Connell*. There the parties had no collective bargaining agreement whatsoever. In this case, the NFLPA and the NFLMC have a current valid collective bargaining agreement, and plaintiff's objection is that the supplemental draft was not validly made part of that agreement. The policies favoring collective bargaining would still be relevant even if that were the case.

*in part,* 593 F.2d 1173 (D.C.Cir.1978), for the proposition that the supplemental draft must be contained in a valid collective bargaining agreement to qualify for the labor ·exemption:

> [A] scheme advantageous to employers and otherwise in violation of the antitrust laws cannot under any circumstances come within the exemption unless and until it becomes part of a collective bargaining agreement negotiated by a union in its own self-interest.

*Id.* at 742. This statement, however, was in response to the NFL's argument that because the draft concerned a mandatory subject of bargaining it was exempt from the antitrust laws even prior to being made part of an agreement with the union. *Id.* The quotation relied on by the plaintiff highlights the requirement of a bargained for, as opposed to a unilaterally imposed, condition. *See* part C *infra.* In light of *Connell,* it cannot be read as limiting the types of agreements that may qualify for the exemption. Plaintiff's arguments regarding the union's decisionmaking process are relevant only to the extent that they reflect on the remaining prongs of the *Mackey* test.

### B.

Plaintiff argues that the supplemental draft fails to satisfy the first prong of the *Mackey* test, namely, that the agreement must primarily affect the parties to the collective bargaining relationship. To support this argument Zimmerman's counsel contends that the primary impact of the draft was upon USFL players who are not members of the NFLPA. Counsel stressed, both in his pleadings and oral argument, that Eugene Upshaw failed to consult with any USFL players before approving the supplemental draft.

 Plaintiff's argument misses the point of the primary effect analysis. The requirement derives from the Supreme Court's determination that federal labor policy justifies the anticompetitive effects of an agreement between labor and management only if they naturally follow from the elimination of competition over wages and conditions of employment. *Connell,* 421 U.S. at 625, 95 S.Ct. at 1836. Thus, while reduced price competition between employers is a natural outgrowth of the standardization of wages within an industry through unionization and collective bargaining, it will not have antitrust implications because the primary effect of such agreements is on the employees and their employer. On the other hand, the restraint imposed by the union in *Connell* was essentially intended to prevent non-union subcontractors from competing for a portion of the market. This type of direct restraint on the business market is not shielded by the labor exemption. *Id.* The purpose of the first prong of the *Mackey* test, then, is to withhold the exemption from agreements that primarily affect competitors of the employer, or, as in *Connell,* economic actors completely removed from the bargaining relationship.

 The plaintiff and other players in his position do not fall into this protected group. Not only present but potential future players for a · professional sports league are parties to the bargaining relationship. This was made clear in a recent case involving a challenge to the National Basketball Association's draft and maximum team salary rules, *Wood v. National Basketball Association,* 602 F.Supp. 525 (S.D.N.Y.1984). The plaintiff in that case, who had not yet signed a contract with an NBA team, claimed that he was not bound by the collective bargaining agreement containing the challenged provisions. The Court rejected this argument: "At the time an agreement is signed between the owners and the players' exclusive bargaining representative, ·all players within the bargaining unit and those who enter the bargaining unit are bound by its terms." *Id.* at 529. As a potential NFL player, Zimmerman was part of the collective bargaining relationship between the NFLPA and the NFL to the extent necessary for purposes of the labor exemption. The supplemental draft affected primarily the NFL teams and the players selected; the first

prong of the *Mackey* test is therefore satisfied. *Cf. Smith,* 420 F.Supp. at 744 ("With regard to the fact that the boycott's impact is on potential employees rather than on competitors of the employer, however, the Court believes that the policies of the labor laws require that such an agreement be found to be within the scope of the exemption to the antitrust laws.").

### C.

We come then to the final prong of the *Mackey* test and what both parties have recognized as the crucial issue of this case: Whether the agreement was the product of *bona fide,* arm's length bargaining between the parties. This analysis denies the labor exemption to anti-competitive agreements imposed unilaterally by one party, usually management, without regard to the interests of the other. Protecting such agreements would not further the congressional policy favoring collective bargaining. *See Jewel Tea,* 381 U.S. at 690, 85 S.Ct. at 1602; *Smith,* 420 F.Supp. at 742. Plaintiff seeks to show that the supplemental draft was unilaterally imposed by the NFL on a weak union and that the characterization of the conversations between Upshaw and Donlan as "bargaining" involving other disputed issues such as roster size was simply a charade, designed by counsel after the fact to immunize the supplemental draft from antitrust challenge.

The facts of this case, as reflected in the uncontradicted deposition testimony of Jack Donlan, Gene Upshaw, and the other NFLPA leaders who were the principal participants in negotiating the agreement, simply do not support the plaintiff's argument. It is clear to the Court that the parties bargained extensively over the issue and that the union representatives concluded that it was in the best interest of the membership to agree to the draft based on the concessions received from the NFL.

The third prong of the *Mackey* test has been met.

A comparison between the bargaining in this case and the circumstances in the other professional sports antitrust cases is enlightening. In *Smith,* a case challenging the 1968 regular draft, there had been no bargaining at all because the draft occurred before the NFLPA was recognized as the players' bargaining agent. 420 F.Supp. at 742. In *Mackey,* although collective bargaining agreements in 1968 and 1970 included the challenged reserve system,[8] the court determined that it was not discussed in *bona fide* bargaining. For one thing, the players didn't make the Rozelle Rule an issue in negotiations. 543 F.2d at 613. Also, the union stood in a very weak bargaining position *vis-a-vis* the league prior to 1974. Finally, the Rule had existed in the same form since 1963, *before* any collective bargaining relationship existed. *Id.* at 615–16. On the other hand, in *McCourt v. California Sports, Inc.,* 600 F.2d 1193 (6th Cir.1979), the court held that the players' union had accepted the National Hockey League's reserve system after good faith bargaining. It recounted the long history of negotiations between the parties, which included the threat of a strike and an antitrust suit, and noted particularly that the union's failure to eliminate or change the reserve system did not mean that bargaining sufficient to exempt the agreement from the antitrust laws had not occurred: "That the position of one party on an issue prevailed unchanged does not mandate the conclusion that there was no collective bargaining over the issue." 600 F.2d at 1201.

The NFLPA appears to be more powerful now than at the time of *Mackey* or *Smith.* The 1982 collective bargaining agreement was reached only after a 57-day strike. It must also be remembered that the agreement in this case was not made during negotiations for a comprehensive

---

**8.** The reserve system in effect at the time of the *Mackey* complaint included the so-called "Rozelle Rule." The Rule severely restricted the bargaining power of a player whose contract had expired, known as a free agent, because the team signing that player was required to provide one or more players and/or draft choices as compensation to the free agent's former team. *Mackey,* 543 F.2d at 609 n. 1.

collective bargaining agreement.[9] Nor was the subject of the agreement as basic as a reserve system, which has potential effects on every union member. Under the circumstances, it is not surprising that negotiations were not as intense and prolonged as in *McCourt*. Nonetheless, the record shows that a fair amount of give and take took place between Upshaw and Donlan. They bargained not only over what the NFL might exchange for the draft, but also over how many rounds would be allowed and other technicalities. The NFLPA Executive Committee wanted to get something in return for the supplemental draft and believed the roster size concession and other agreements were good enough. Of course, the union's bargaining position was not especially strong. Under the current collective bargaining agreement, the NFL could have either set aside a few rounds of the regular draft for players in the USFL or continued to draft USFL players in the regular draft as it did in 1983.

Plaintiff makes two points in an attempt to show that the existence of good faith bargaining remains dependent on disputed factual issues. First, he notes that the *"quid pro quo"* supposedly received by the Union was not reflected in the letter agreement in which the union agreed to the draft. Second, he alleges that the concessions the NFL made in return for the supplemental draft were meaningless and therefore cannot support a finding that the agreement was the result of good faith bargaining.

With regard to the first point, *Mackey* requires that there be actual *bona fide*, arm's-length bargaining. 543 F.2d at 614. A *quid pro quo* is some evidence that the bargaining took place and that it was done at arm's length. In *McCourt*, for example, the court pointed to various provisions in the collective bargaining agreement relating to the reserve system as illustrations that good faith bargaining had taken place. 600 F.2d at 1202–03. It is for this reason that the NFLPA has stressed that it received something in return for agreeing to the supplemental draft. But nothing in either *Mackey* or *McCourt* requires that a *quid pro quo* be contained in the agreement under consideration.[10] The Court must simply decide whether the parties engaged in good faith bargaining. If it appears that the agreements regarding the draft and the other issues were related and a result of bargaining, it does not matter whether they were memorialized in a single binding agreement.

Zimmerman's second point may be interpreted two ways—either that the union was "taken" or that the *quid pro quo* was a sham. He argues that since the NFL owners had planned all along to keep the roster size at 49, that agreement could not have been a *quid pro quo* for the supplemental draft. In a memorandum to the NFLMC Executive Committee transmitting the letter agreement on the supplemental draft, Jack Donlan stated: "Nothing was given by us in exchange for the Agreement." Donlan Deposition, Exhibit 6. Donlan testified that by this he meant that he had not given in on the pension contribution issue, about which the owners were quite concerned. Instead, according to Donlan, the main concession to the players in exchange for the supplemental draft was the 49 player roster limit which the owners had indicated in Hawaii was their preference in any event. At oral argument, Zimmerman expanded upon his attack on the

---

**9.** As noted above, the labor exemption does not only apply to formal collective bargaining agreements. *Supra* pp. 404–405. It follows that *bona fide*, arm's-length bargaining can occur outside of formal negotiations on a comprehensive agreement. This is consistent with the established labor law principle that collective bargaining is an ongoing process. *See Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

**10.** In *Mackey*, the NFL argued that a few concessions made to the players were a *quid pro quo* for acceptance of the Rozelle Rule. The district court did not think that such a *quid pro quo* existed, even though both the concessions and the Rozelle Rule appeared in the same collective bargaining agreement. 543 F.2d at 616.

supposed concessions obtained by the NFLPA by noting that in agreeing to resume providing player contracts, NFLMC offered nothing beyond its original obligation under Article XII of the 1982 collective bargaining agreement. The NFLPA countered that the agreement was of substantial value to the union because it avoided the costly delay of a lengthy grievance proceeding before the National Labor Relations Board.

 It is not the Court's function in the context of the labor exemption to evaluate the relative bargaining prowess and strategy of the parties, to determine who secured the better deal or whether there was adequate consideration exchanged. The important question is whether *bona fide* bargaining took place such that the policies in favor of such bargaining should take precedence over antitrust concerns. Because the owners gave up something they were already prepared to grant does not mean that there was an absence of bargaining or that it was conducted in bad faith. In fact, that the union was convinced that roster size was a significant issue over which they needed to bargain is evidence of the arm's-length relationship between the parties. Similarly, the Court is convinced that the union felt the various agreements it entered into were in its best interest. It is the union's honest, albeit subjective, perception that is relevant to the existence of good faith bargaining rather than the Court's objective determination of the comparative value of the consideration exchanged.

In sum, the Court finds that the agreement to allow a supplemental draft in 1984 satisfies all prongs of the *Mackey* test. The defendants cannot be liable under the antitrust laws for the effects of that agreement.

## II.

 Even if the labor exemption did not apply, defendants would be entitled to summary judgment on another ground. Plaintiff Zimmerman brings suit under section 4 of the Clayton Act which grants a private right of action to a "person injured in his business or property *by reason of* anything forbidden in the antitrust laws." 15 U.S.C. § 15 (emphasis added). Causation between the injury and the alleged antitrust violation is a well established requirement in private antitrust cases. *Federal Prescription Service, Inc. v. American Pharmaceutical Association,* 663 F.2d 253, 268 (D.C.Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982); *see also Zenith Radio Corp. v. Hazeltine,* 395 U.S. 100, 113–14 & n. 4, 89 S.Ct. 1562, 1571–72 & n. 4, 23 L.Ed.2d 129 (1969). The level of proof demanded of the plaintiff on this issue is high. Our Circuit Court has said that "the 'fact of injury' must be 'certainly proved,'" *id.* (quoting *Poster Exchange, Inc. v. National Screen Service Corp.,* 431 F.2d 334, 340 (5th Cir. 1970)), *cert. denied,* 401 U.S. 912, 91 S.Ct. 880, 27 L.Ed.2d 811 (1971), or at least "reasonably certain." *Id.* at 270. Zimmerman has no cause of action because he cannot prove that he was injured "by reason of" the supplemental draft.

There are a number of cases in which the causation requirement has been fatal to an antitrust claim. In *Green v. Associated Milk Producers, Inc.,* 692 F.2d 1153 (8th Cir.1982), for example, the plaintiffs charged that a dairy cooperative and two independent milk-haulers conspired to divide up territories and later boycott and terminate the plaintiffs' business. The court ruled that there was no evidence of a conspiracy to have the plaintiffs fired and that no causal relationship had been shown between the division of territories and the injury suffered. *Id.* at 1157–58. It was therefore unnecessary to decide whether the territorial restrictions were lawful. Similarly, in *H & B Equipment Co v. International Harvester Co.,* 577 F.2d 239 (5th Cir.1978), the plaintiff alleged that Harvester, for whom it distributed agricultural machinery, had unlawfully prevented it from bidding on government and rental contracts. The claim of unlawful customer restrictions failed because the plaintiff had not produced any evidence of

its ability to penetrate the markets that defendant had supposedly reserved to itself. *Id.* at 246–47; *see also Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705 (11th Cir.1984); *J.T. Gibbons, Inc. v. Crawford Fitting Co.,* 704 F.2d 787 (5th Cir.1983); *Pitchford v. PEPI, Inc.,* 531 F.2d 92 (3d Cir.1975), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976).

Zimmerman's counsel complains he has been denied the discovery necessary to prove injury. *See supra* note 3. It is clear, however, that he is referring to the *amount* of damages which is a different issue than that raised by the NFL. *See Federal Prescription Service,* 663 F.2d at 268; *H & B Equipment Co.,* 577 F.2d at 246 (distinguishing between the amount of damages and the fact of injury or causation). He then argues that it is speculative to suggest that he would have been selected in the regular draft and that if he had been, his rights might have gone to a team that might have offered him more money, a better location, and generally more security for his family.

In 1983, thirteen players under contract to the USFL were drafted by NFL teams. Given that Zimmerman was the third choice in the supplemental draft and a coveted and highly regarded lineman, it is virtually certain that he would have been chosen in the regular NFL draft had he been eligible. Affidavits of Bobby Beathard, General Manager of the Redskins, Gil Brandt, Vice President of the Cowboys, and the deposition of Al Davis support this assessment. Zimmerman's chances of being drafted by one of his preferred teams (i.e. the four teams on the West Coast) were the same in both drafts: one in seven. And under one

of the possible alternatives to the supplemental draft, setting aside a few rounds of the regular draft exclusively for USFL players, Zimmerman might very well have been selected by the New York Giants. Most importantly, the right to sign Zimmerman would have been held by only one team in the NFL, regardless of the alternative selected. What Zimmerman wants is to be a free agent, to be able to negotiate with all 28 NFL teams. That would not have happened even in the absence of the challenged draft. Therefore, as a matter of law, Zimmerman cannot show that he was injured "by reason of" the supplemental draft.

On basis of the above, the Court determines that the plaintiff's claims are lacking in merit. An appropriate order will be entered.[11]

---

**11.** On March 25, 1986, plaintiff filed a motion to amplify the record based upon "newly discovered evidence." That evidence is a portion of the deposition of Howard Cosell taken in an unrelated antitrust case, *United States Football League v. National Football League,* 84 Civ. No. 7489 (S.D.N.Y.). Cosell's testimony concerned an informal conversation with Chuck Sullivan, President of the New England Patriots and member of the NFLMC, in which Sullivan expressed the opinion that the supplemental draft violated the antitrust laws. The defendants promptly responded to the plaintiff's motion.

Plaintiff's motion is denied. It is untimely; plaintiff's counsel was aware of the Cosell deposition long before the cross-motions for summary judgment were argued before this Court. The testimony is of little, if any, relevance to the issues discussed in this Memorandum Opinion. The statements of Mr. Sullivan appear to run afoul of the hearsay rule. Fed.R.Evid. 801. In any event, the "off the cuff" opinions on the legal issues in this case voiced in the deposition, even if admissible, would have no effect on the Court's consideration of this matter.